12746

STATE *EX REL.* RICHARDS v. MOORER *ET AL.*
STATE *EX REL.* FARR v. SAME
JOHNSON *ET AL.* v. STATE HIGHWAY COMMISSION *ET AL.*

(150 S. E., 269)

460

Messrs. *Cole L. Blease, Haynesworth & Haynesworth,* and *D. W. Robinson,* for petitioners, ▮

*Messrs. Harold Major,* and *A. H. Dagnall,* also for petitioners,

*Messrs. Samuel M. Wolfe,* and *Thomas & Lumpkin,* also for petitioners,

*Attorney General John M. Daniel,* and *Asst. Atty. Generals Cordie Page,* and *J. Ivey Humphrey,* for respondents,

*Mr. R. E. Whiting,* also for respondents,

*Messrs. Nicholls, Wyche & Byrnes,* for respondents,

*Mr. William C. Wolfe,* also for respondents,

*Mr. Mendel L. Smith,* for respondents,

October 12, 1929.

The opinion of the Court was delivered by Mr. Justice Stabler.

The common purpose of the above-entitled actions, brought in the original jurisdiction of this Court by several citizens and taxpayers, either in their own names or in the name of the State, is to have a certain Act of the General Assembly (36 St. at Large, p. 670), approved March 14, 1929, declared unconstitutional and void, and to have the respondents permanently enjoined from carrying out its provisions. The cases involve practically the same issues and I shall consider them together.

The Chief Justice of this Court, for whose views I have the greatest respect, has written an opinion in which he has reached the conclusion that the act in question contravenes certain provisions of the Constitution and is therefore invalid. I greatly regret that, after a careful study of the act and of the issues involved in these proceedings, I do not find myself in full agreement with his views and conclusions; and shall endeavor to state my reasons therefor.

The title of the act is as follows: "An Act to Provide for the Construction and Maintenance of the State Highway System and for the Payment, with Interest, of Certain Obligations of the State Highway Commission and of Counties and Highway or Bridge Districts Arising from the Construction of Highways, and for These Purposes to Authorize the Issuance of Evidences of Indebtedness of the State, to Divide the State into Two Highway Districts, to Authorize the Issuance of Evidences of Indebtedness of These Dis-

tricts, to Appropriate and Provide for the Disposition of the Gasoline Tax and Motor Vehicle License Fees and Other Revenues, and to Provide for the Administration and Operation of the State Highway Department."

The Act contains a preamble, setting forth certain legislative recitals and findings of fact as the basis of the legislation proposed, and declaring that: "In the judgment of the General Assembly, an immediate investment by the State in a complete State Highway System in accordance with the financial plans set forth in this Act would be not only self-sustaining—never costing the taxpayers of the State one cent of property taxes—but would also produce great profits or dividends which cannot be stated in terms of money." I shall hereafter refer more particularly to this preamble.

The Act is divided into three articles, the first of which provides for establishing a state unit plan for financing the completion of the construction of the state highway system; Article 2 provides for a district unit plan of financing; and Article 3 contains certain general provisions and relates, in part, to matters of an administrative nature.

In considering the issue presented in this case, the constitutionality of a statute, I fully appreciate the importance and seriousness of some of the questions raised by the petitioners; but, as stated in *Wingfield v. South Carolina Tax Commission,* 147 S. C., 116; 144 S. E., 846, 848, I am "also mindful of the fact that it is a grave matter to declare a solemn enactment of the Legislature, a coordinate branch of the government, invalid, and that the Court in its deliberation and conclusions should be guided by the well-settled principle that the unconstitutionality of an Act must be shown beyond a reasonable doubt. *McKiever et al. v. City of Sumter et al.,* 137 S. C., 266, 135 S. E., 60; *Poulnot v. Cantwell,* 129 S. C., 171, 123 S. E., 653; *Battle v. Willcox,* 128 S. C., 500, 122 S. E., 516; *Santee Mills v. Query,* 122 S. C., 158, 115 S. E., 202; *Powell v. Hargrove,* 136 S. C., 345, 134 S. E., 380."

The following clear statement of this principle is found in 6 R. C. L., p. 75: "To justify a Court in pronouncing a legislative Act unconstitutional or a provision of a State Constitution to be in contravention of the Constitution of the United States, the case must be so clear as to be free from doubt, and the conflict of the statute with the Constitution must be irreconcilable, because it is but a decent respect to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed to presume in favor of its validity until the contrary is shown beyond reasonable doubt. Therefore, in no doubtful case will the judiciary pronounce a legislative Act to be contrary to the Constitution. To doubt the constitutionality of a law is to resolve the doubt in favor of its validity."

I shall now proceed to consider the several grounds upon which the constitutionality of the Act is attacked.

I. It is contended that the Act in question is violative of Section 17 of Article 3 of the State Constitution, which provides that "Every Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

In *Verner v. Muller*, 89 S. C., 117, 71 S. E., 654, 655, with regard to this provision, the Court said: "The mandate of the Constitution is complied with if the title states the general subject of legislation and the provisions in the body of the Act are germane thereto as means to accomplish the object expressed in the title. *Connor v. Railroad*, 23 S. C., 427; *State v. O'Day*, 74 S. C., 448, 54 S. E., 607."

The controlling principle of construction is that stated in *Lillard v. Melton*, 103 S. C., 10, 87 S. E., 421, 423: "When the general subject is expressed in the title, any details of legislation which provide the means, methods, or instrumentalities which are intended to facilitate the accomplishment of the general purpose, and are germane to it, may be embraced in the body of the Act without violating this provision of the Constitution. *State v. O'Day*, 74 S. C., 449, 54

S. E., 607; *Aycock-Little Co. v. Railway,* 76 S. C., 331, 57 S. E., 27; *Johnson v. Commissioners,* 97 S. C., 212, 81 S. E., 502."

"It is not necessary that the title should be an index of the contents of the statute." *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153, 163. See, also, *Means v. Highway Department,* 146 S. C., 19, 143 S. E., 360; *McKiever v. City of Sumter,* 137 S. C., 266, 135 S. E., 60.

Counsel for petitioners have failed to indicate any proper basis for their contention. Measured by the rules of construction above indicated, an examination of the wording of the title and of the provisions of the Act satisfies any doubt that the constitutional mandate in that respect was fully complied with. It cannot be fairly contended that the body of the Act contains a single clause that may not be properly viewed as "a means to accomplish" the expressed objects thereof or as "matter promotive" of the general object, which is the construction and maintenance of a state highway system; or that the people of the State were not "fairly apprised" of the character, through publications, of the pending legislation. There is no merit in this contention.

II. The petitioners also challenge the constitutionality of the Act upon the following grounds: (1) That it did not receive three readings in each of the Houses of the General Assembly on three several days, and so violated Section 18 of Article 3 of the Constitution; (2) that, although a revenue measure, it did not originate in the House of Representatives, and so violated Section 15 of Article 3 of the Constitution; and (3) that it was improperly amended during its passage.

This question, in its threefold aspect, is disposed of adversely to the contention of the petitioners by the recent decision of this Court in *Wingfield v. Tax Commission, supra,* in which the Court said:

"Prior to 1893, the journal entry rule prevailed in this State. *State v. Platt,* 2 S. C., 150, 16 Am. Rep., 647. *State*

*v. Hagood,* 13 S. C., 46. In each of these cases, however, a vigorous dissenting opinion was filed. In his dissent in the *Hagood case,* Mr. Justice McIver said:

" 'The true rule, in my judgment, is that when an Act has been enrolled, has had the great seal of the State affixed to it, has been signed by the president of the Senate and speaker of the House of Representatives and has been approved by the Governor, it imports absolute verity; that its terms can only be finally ascertained by an inspection of the enrolled Act, and that it is not competent to go behind it, and alter its terms either by entries in the journals of the two houses or any other evidence.'

"In the case of *State ex rel. Hoover v. Chester,* 39 S. C., 307, 17 S. E., 752, decided in 1893, the question was again considered. In a unanimous opinion the Court overruled the *Platt and Hagood cases,* and adopted the enrolled bill rule in the following unmistakable language:

" 'We announce that the true rule is, that when an Act has been duly signed by the presiding officers of the General Assembly, in open session in the Senate-House, approved by the Governor of the State, and duly deposited in the office of the Secretary of State, it is sufficient evidence, nothing to the contrary appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an Act. And this being so, it follows that the Court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original bill.' "

The Court gives the following reasons for the adoption of the enrolled bill rule: "Public policy, certainty as to what the law is, convenience, and that respect due by the Courts to the wisdom and integrity of the Legislature a co-ordinate branch of the government, all require that the enrolled bill, when

fair upon its face, should be accepted without question by the Courts. 26 Am. & Eng. Ency. of Law, p. 557; *State of Washington, ex rel. Thomas M. Reed, Jr., v. W. C. Jones, Attorney General,* 6 Wash., 452, 34 P., 201, 23 L. R. A., 340; *Atchison Railway Co. v. State of Oklahoma,* 28 Okl., 94, 113 P., 921, 40 L. R. A. (N. S.), 1; *Field v. Clark,* 143 U. S., 649, 12 S. Ct., 495, 36 L. Ed., 294 and the cases cited therein."

As the enrolled Act in the present case fully meets all the requirements of the enrolled bill rule as laid down in the *Wingfield case,* it is not competent to attempt to impeach it by evidence outside the Act itself.

III. In the proposed opinion it is said: "A very serious objection is made to the entire Act, which concerns both plans, that it is an alternative law, dependent upon the will and option of a department of the Executive branch of the government; in effect a delegation of legislative prerogatives and duties."

The provision objected to is found in Section 1 of Article 2, and is as follows: "Instead of requesting the Governor to issue State highway certificates of indebtedness or notes as provided in Article I of this Act, the State Highway Commission may, at its option, enter into one or more reimbursement agreements with one or both of the highway districts created by this article, and certificates of indebtedness and notes of these highway districts may be issued, as provided in this article."

The conclusion reached by the writer of the proposed opinion is that this provision is not permissible legislation and renders invalid the entire Act.

It is a primary principle that in our system of government the legislative, executive, and judicial departments must be kept separate and independent. With regard to the rule that the Legislature cannot delegate its power to make laws, the following from Cooley's Constitutional Limitations is quoted with approval in *Vesta Mills v.*

*City Council,* 60 S. C., 1, 38 S. E., 226, 228: " 'One of the settled maxims in constitutional law is that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made, until the constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved; nor can it substitute the judgment, wisdom, and patriotism of any other body for those for which alone the people have seen fit to confide this sovereign trust.' "

There is a distinction, however, between delegating power to make a law and conferring authority or discretion as to its execution. If a legislative Act is clothed with all the forms of law and is complete in itself in form and substance, if the officer, board, or commission to whom the authority is alleged to have been delegated is given no power to add to or to take away from the law as enacted, if nothing is left to discretion as to what shall constitute the form and substance of the statute, and if the Act embodies a full and complete expression of the legislative will, matters which may be fairly regarded as relating to the administration and execution of the statute, even though involving discretion, do not constitute an unauthorized delegation of legislative authority.

Judge Cooley says further (8th Ed.), 228: "The maxim that power conferred upon the Legislature to make laws cannot be delegated to any other authority does not preclude the Legislature from delegating any power not legislative which it may itself rightfully exercise. It may confer an authority in relation to the execution of a law which may involve discretion, but such authority must be exercised under and in pursuance of the law. The Legislature must declare

the policy of the law, and fix the legal principles which are to control in given cases; but an administrative officer or body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done there would be infinite confusion in the laws and in an effort to detail and to particularize, they would miss sufficiency both in provision and execution."

In 6 Am. & Eng. Ency. (2d Ed.), 1029, the following appears: "There is no constitutional reason why legislative functions which are merely administrative or executive in their character should not be delegated by that branch of the government to other departments, or to bodies created by it for that purpose. A distinction is drawn between a delegation of power to make the law, involving necessarily a discretion as to what it shall be, and a grant of authority relative to its execution, though the latter involves the exercise of discretion under and in pursuance of the law."

In 6 R. C. L., 174, the writer says: "All laws are carried into execution by officers appointed for the purpose, and these are clothed with a power which often necessarily involves in a large degree the exercise of discretion and judgment."

And at page 165: "One of the most important tests as to whether particular laws amount to an invalid delegation of legislative power is found in the completeness of the statute as it appears when it leaves the hands of the Legislature."

With respect to this rule, we find the following in 12 C. J., at page 840: "While, however, the Legislature may not delegate the exercise of its discretion as to what the law shall be, it may confer discretion in the administration of the law. Also, the Legislature has power, when enacting a statute creating a new right with its remedy, to vest in some board or person power to adjudicate all matters arising under the statute, and to make such adjudication final and conclusive. The difficulty lies, not in determining the governing principle, but in its application to concrete cases. With the growing

complexity of modern life, the multiplication of the subjects of governmental regulation, and the increased difficulty of administering the laws, there is a constantly growing tendency toward the delegation of greater powers by the Legislature, and toward the approval of the practice by the Courts; but this variety of conditions and circumstances, and of laws intended to meet them, has led to a variety of judicial decisions and utterances which the Courts have found difficult to harmonize. Such powers of delegation naturally vary with the scope and authority of the delegating body, Congress and the State Legislatures possessing much wider powers in this respect than the legislative bodies of municipal corporations."

The reports are full of decisions illustrative of the distinction adverted to. I shall not attempt even an incomplete collation of these authorities, but shall content myself with citing a few typical cases.

"A statute authorizing a particular officer to pass upon the question of character, to determine the granting of license is not a delegation of legislative power. Delegation of power to determine who are within the operation of the law is not a delegation of legislative power. *State v. Thompson,* 160 Mo., 333, 60 S. W., 1077, 83 Am. St., 468, 54 L. R. A., 950. So statutory delegation of power to incorporated medical societies to appoint medical examiners to examine and pass upon the fitness of applicants for license to practice medicine is not invalid. *Schoole v. State,* 90 Md., 729, 46 A., 326, 50 L. R. A., 411. See, also, *People v. Witte,* 315 Ill., 282, 146 N. E., 178, 37 A. L. R., 672." Cooley's Constitutional Limitations (8th Ed.), 230 (note).

Enactments have been generally upheld that confer authority upon municipalities to enact and enforce ordinances (*Buffalo v. Stevenson,* 207 N. Y., 258, 100 N. E., 798), upon administrative boards to fix rates (*Interstate Commerce Commission v. Railroad Company,* 168 U. S., 144, 18 S. Ct., 45, 42 L. Ed., 414), upon a fire commissioner to in-

stall means to prevent fires (*People v. Kaye,* 212 N. Y., 407, 106 N. E., 122), upon boards of health to enact sanitary rules and ordinances (*People v. Van De Carr,* 199 U. S., 552, 26 S. Ct., 144, 50 L. Ed., 305), on a commissioner of agriculture to make needful rules with regard to food and food traffic (*People v. Dairy Company,* 222 N. Y., 416, 119 N. E., 115, 3 A. L. R., 1260), upon the Secretary of the Treasury to determine the standards of quality of imported tea (*Buttfield v. Stranahan,* 192 U. S., 470, 24 S. Ct., 349, 48 L. Ed., 525), upon the State Board to revoke license of architect for gross incompetency in construction of building. (*Klafter v. Board of Examiners,* 259 Ill., 15, 102 N. E., 193, 46 L. R. A. (N. S.), 532 Ann. Cas., 1914–B, 1221), upon commissioners of land office to grant lands upon navigable waters for the promotion of state commerce and the enjoyment of adjacent owners (*Rumsey v. Railway Co.,* 130 N. Y., 88, 28 N. E., 763), upon the President of the United States to reduce revenue and equalize duties on imports, and to suspend by proclamation the free introduction of sugar, etc. (*Field v. Clark,* 143 U. S., 649, 12 S. Ct., 495, 36 L. Ed., 294).

*Codman v. Crocker,* 203 Mass., 146, 89 N. E., 177, 180, is very much in point. The Court said: "Objection is made to the action of the commission on the ground that the statute involves an unconstitutional delegation of legislative authority. But the Legislature determined that a railway for the same general service might be constructed by either of two routes to either of two termini, and left to this commission the question of administration as to which of the two modes of building this great public work would be the better. This was a delegation only of such powers as often have been left to boards of public officers with the approval of this and other Courts. *Brodbine v. Revere,* 182 Mass., 598, 66 N. E., 607; *Lynn v. Essex County,* 148 Mass., 148, 19 N. E., 171; *Martin v. Witherspoon,* 135 Mass., 175; *Opinion of Justices,* 138 Mass., 601; *Welsh v. Swasey,* 193 Mass.,

375, 79 N. E., 745, 118 Am. St. Rep., 523, 23 L. R. A. (N. S.), 1160; *Field v. Clark*, 143 U. S., 639, 12 S. Ct., 488, 36 L. Ed., 285; *In re Kollock*, 165 U. S., 526, 17 S. Ct., 444, 41 L. Ed., 813; *Agawan v. Hampden*, 130 Mass., 528; *Flood v. Leahy*, 183 Mass., 232–236, 66 N. E., 787; *Commonwealth v. Union Passenger R. Co.*, 163 Pa., 22, 29 A., 711; *People v. Dunn*, 80 Cal., 211, 22 P., 140, 13 Am. St. Rep., 118."

In *Trustees of Saratoga Springs v. Saratoga Gas, Electric Light & Power Co.*, 191 N. Y., 123, 83 N. E., 693, 695, 18 L. R. A. (N. S.), 713, it was held (quoting syllabus) : "No unconstitutional delegation of legislative power is effected by conferring on an administrative commission the power to fix the maximum rates which the Legislature declares shall be charged by gas companies." 18 L. R. A. (N. S.), 713.

The Court in this case said :

"The argument against the constitutionality of the underlying feature of the statute proceeds on two propositions— one that legislative power cannot be delegated, and the other that rate making is a legislative power. Both propositions are true, if not construed too broadly, but each is liable to such misconstruction. To be strictly accurate, the first requires the qualification pointed out by Chief Justice Marshall in *Wayman v. Southard*, 10 Wheat. (U. S.), 1, 42, 6 L. Ed., 253 : 'It will not be contended that Congress can delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others powers which the Legislature may rightfully exercise itself.' If by the second proposition it is intended to assert that the rate-making power being part of the police power is vested in the Legislature, it is true. But if it is intended to go further and deny the power of the Legislature to confer by general laws upon other branches of the government, the duty not only of executing the law, but of determining its application to particular cases and the

formulating rules for its exercise, then in my judgment it is not true. * * *

"While no consideration of convenience or of supposed necessity would justify us in ignoring any constitutional mandate or limitation, it must be remembered that we have no express constitutional provision on the subject, and that it is sought to condemn the legislation before us solely by extending the principle that the Legislature cannot delegate legislative powers, a principle which, though unquestionably true is, as we have seen, true only within limits to a point that would render efficient legislation on the subject impracticable. It cannot be said, to use the language of Justice Harlan, that in any real sense the Legislature has delegated its power to the commission. The statute is complete. The Legislature, not the commission, has enacted that there shall be maximum rates for the charges of the gas and electric light companies, and that light shall be furnished to consumers at those rates, and has provided the penalty for extorting greater charges for service. What is intrusted to the commission is the duty of investigating the facts, and, after a public hearing, of ascertaining and determining what is a reasonable maximum rate. I cannot see how the duty intrusted to the commission in this case differs in principle from that imposed on the President to determine that duties were reciprocally unequal or on the Secretary of the Treasury to determine what was inferior tea."

The Courts of this State are in line with those of other jurisdictions in applying the rule and the distinction pointed out. In *Wingfield v. South Carolina Tax Commission, supra,* the following from *Santee Mills v. Query,* 122 S. C., 158, 115 S. E., 202, is quoted with approval: " 'It is elementary that, while the Legislature may not delegate its power to make laws, it may vest in administrative officers and bodies a large measure of discretionary authority, especially to make rules and regulations relating to the enforcement of the law. 12 C. J., 844–853; *Port Royal Min. Co. v. Hagood,*

30 S. C., 519, 9 S. E., 686, 3 L. R. A., 841; *Michigan Cent. R. Co. v. Powers,* 201 U. S., 245, 26 S. Ct., 459, 50 L. Ed., 744; *Leser v. Lowenstein,* 129 Md., 244, 98 A., 712.'"

In *Port Royal Min. Co. v. Hagood,* 30 S. C., 519, 9 S. E., 686, 688, it was held that an Act authorizing the State Board of Agriculture "to grant or refuse" licenses to mine for phosphate rock, "as the said board may, in its discretion, deem best for the interests of the State," etc., was not an unconstitutional delegation of legislative power to the board. The Court said: "It is undoubtedly true that legislative power cannot be delegated; but it is not always easy to say what is and what is not legislative power, in the sense of the principle. The Legislature is only in session for a short period of each year, and during the recess cannot attend to what might be called the business affairs of the State. From the necessity of the case, as well as the character of the business itself, that must be performed by agents appointed for that purpose, such as the railroad commission, regents of the lunatic asylum, the State Board of Canvassers of elections, 'sinking fund commission,' etc. The numerous authorities cited in the argument show conclusively, that, while it is necessary that the law itself should be full and complete as it comes from the proper law making body, it may be, indeed must be, left to agents in one form or another to perform acts of executive administration which are in no sense legislative. Without encumbering this opinion with the authorities, we think the view is well stated in *Locke's Appeal,* 72 Pa. St., 491 [13 Am. Rep., 716] : 'Then the true distinction, I conceive, is this: The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' "

The conferring of an option on a commission by the Legislature is by no means a new doctrine in this State. Such course has been followed a number of times since the year 1924 in connection with the construction of highways in this State.

"Under the Act of 1924 (33 Stat., 1193), amended by Act of 1925 (34 Stat., 51), two alternative plans were authorized for the construction of the highways designated therein: (1) By the State Highway Commission, by means of funds provided by the Act, consisting of the automobile license tax, three-fifths of the five-cent gasoline tax (Act of 1925, p. 56, § 11), and all Federal Aid moneys, within a period to be determined by the commission, and which has been estimated at 18 years, beginning January 1, 1924; (2) By the several counties, by permission of the State Highway Commission, and under a reimbursement agreement with the commission by which the value to the State of such construction shall be refunded to the County out of the funds made available by the Act, in equal annual installments, during the estimated period of construction.  *  *  *

"In Section 12-a of the Act [Coastal Highway Act], it is provided that at the option of the Board of Coastal Highway Commissioners, the reimbursement agreement between the commission and the district may be made between the commission and the six counties named, so that the six counties, acting by the board, shall jointly agree to advance the moneys necessary to construct the highway, and the commission shall agree to reimburse said counties for the money so advanced, with like effect as if the agreement had been made between the commission and the district." *Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538, 540.

In the Act (34 Stat., 1001), involved in *Briggs v. Greenville County, supra,* a road district coterminous with Greenville County was created, and the State Highway Commission was given the option of entering into reimbursement agreements, with either the road district, a district and

separate corporate entity, or Greenville County, which was also vested with an entirely separate corporate existence and powers.

Though the constitutionality of the Coastal Highway Act and the Greenville County District Act was vigorously assailed on other grounds, the alternative or optional features of these Acts were not made grounds for such attack. If the Act in the present case may be held unconstitutional for the reason here urged, may not the Coastal Highway Act and the Greenville County District Act, as well as the Pay-As-You-Go Act of 1924 (33 St. at Large, p. 1193), be held invalid for the same reason?

All other authorities aside, the question seems to me to be settled by the decision in *Ruff v. Boulware,* 133 S. C., 420, 131 S. E., 29, 30. In that case the Court construed a statute authorizing the establishing of a chain gang in Fairfield County "upon the unanimous written consent of the legislative delegation" from that county "to be filed with the Board of County Commissioners." A reading of the Act discloses that the consent of the legislative delegation, necessary for the operative effect of the statute under its provisions, was not predicated upon the determination of any fact or state of facts by the delegation as a prerequisite to such consent, but was left entirely to the arbitrary decision of the delegation itself. In upholding the constitutionality of the statute, the Court, speaking through Mr. Justice Marion, said:

"Appellants' exceptions * * * make the two points: (1) That the statute is, in effect, a delegation of the legislative power of the State, in contravention of Section 1, Art. 3, of the Constitution, in that it is not in itself a definite and final exercise of the legislative power vested in the General Assembly, but undertakes to make a law dependent upon the arbitrary consent of the legislative delegation, without laying down any 'rule by which, or event upon which, the legislative delegation is to exercise its consent.' * * *

"As to the first of the foregoing contentions, we are clearly of the opinion that the Act may not soundly be declared null and void as an unconstitutional delegation of legislative power.

" 'Where an Act is clothed with all the forms of law, and is complete in and of itself, it is fairly within the scope of the legislative power to prescribe that it shall become operative only on the happening of some specified contingency. Such a statute lies dormant until called into active force by the existence of the conditions on which it is intended to operate. * * * This contingency may consist of some act or acts to be performed by public officers, or by the people or parties interested; or it may be the recommendation of a grand jury, or consist of the determination of some fact or state of things on the part of the people of a municipality or other body or officers. The nature of the condition is broadly immaterial.' 12 C. J., pp. 864–865, § 365.

"The Act here in question was complete in form and substance, and became a law *in praesenti* upon its approval by the Governor. Its scope and object, in so far as the exercise of the State's legislative power is concerned, were broadly to permit and authorize, upon the terms and conditions prescribed, the establishment and operation of a chain gang in the County of Fairfield—a permission and authority which, it seems, had been, expressly or impliedly, withdrawn or denied by a prior Act of the Legislature abolishing the chain gang in Fairfield County. 32 Stat. at Large, 70. By prescribing, in effect, that the Act should only become operative upon the filing of the written consent of the legislative delegation with the Board of County Commissioners, the General Assembly parted with and delegated no legislative power. The public officials constituting the legislative delegation were given no power to add a jot to, or take a tittle from the law as enacted. Nothing was left to their discretion as to what should constitute the form and substance of the statute, and, regardless of whether or not it ever became operative by

compliance with the condition prescribed by the Legislature itself, it was nevertheless a valid law, in the sense that it was a full and complete expression of the Legislative will and power. As is well said in Sutherland on Statutory Construction, § 68:

" 'The true distinction is between the delegation of power to make the law, which involves a discretion as to what the law should be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no objection can be made.'

"In so far as the provision with respect to the filing of 'consent' by the legislative delegation, the contingency upon the happening of which the law was to go into effect, confers any authority or discretion on the persons designated, it is an authority or discretion as to the execution of the law and not as to what the law shall be. In the limited time available to the writer, a discriminating reference to, and citation of, pertinent decisions from other jurisdictions tending to support that view cannot be undertaken. The conclusion, as we apprehend, is in substantial accord with the views of this Court on the question of invalid delegation of legislation as expressed in *Port Royal M. Co. v. Hagood,* 30 S. C., 525, 9 S. E., 686, 3 L. R. A., 841; *Burriss v. Brock,* 95 S. C., 110, 79 S. E., 193, and *Lillard v. Melton,* 103 S. C., 18, 87 S. E., 421. For the reasons indicated, the contention that the Act is void as an unconstitutional delegation of legislative power cannot be sustained."

As I understand the matter, the decision on this point in the proposed opinion is grounded upon these propositions: (1) That the Legislature cannot delegate power to make a law; (2) that it can delegate to others power to determine some fact or state of things upon which the operation of a law it has enacted shall be dependent; (3) that it cannot vest arbitrary discretion in any officer or body, but must pre-

scribe some rule of action by which the discretion shall be controlled.

I think that a more accurate statement of the first ■ proposition would be that the Legislature cannot delegate powers which are *strictly and exclusively legislative,* but that it may delegate to others powers which it may rightfully exercise itself. Chief Justice Marshall in *Wayman v. Southard, supra.* With the rule as thus stated I am in agreement.

The second proposition is undoubtedly correct law ■ and is broad enough to cover the facts of many cases in which it is pronounced. But I do not think it states *all the law* covering the delegation of power to determine whether a statute shall become operative. The authorities do not seem to limit such delegation of power to cases where the agency to which the power is delegated shall make a determination of a fact or state of things as a prerequisite to the operation of the law. There are numerous cases in which the operation or scope of operation of a statute has been left to the decision of some governmental officer or board, or of the people interested, without prescribing the determination of any fact or state of things as a prerequisite to the exercise of such power—it has been left to them merely to decide whether the Act shall be operative.

Such a case is *State ex rel. Witter v. Forkner,* 94 Iowa, 1, 62 N. W., 772, 774, 28 L. R. A., 206, in which a statute providing, among other things, that on consent of a city council, to which the consent of a majority of the electors is a condition precedent, certain penalties of a prohibitory liquor law may be suspended, is held not unconstitutional as a delegation of legislative power. The Court said: "It is no doubt true that the General Assembly cannot legally submit to the people the proposition whether an Act shall become a law or not, for the people have no power, under our form of government, in their primary or individual capacity, to make laws. This they must do by their representatives. But

the constitutional objection to the law is met, if the Act, when it came from the Legislature, received the Governor's approval, and was properly published, and was, of itself, a *complete and perfect enactment.* * * * The popular will is expressed under and by virtue of a law that is in force and effect, and the people neither make or repeal it. They only determine *whether a certain thing shall be done under the law, and not whether said law shall take effect.* The law had full and absolute vitality when it passed from the hands of the Legislature; and the people under the 'rule of action' therein given for their government, proceeded to act. * * * The Act in question is complete in itself, requiring nothing further to give it validity, and does not depend upon the popular vote of the people, or, if it does, depends upon this vote simply to determine *the limits of its operation.* The rule * * * is supported by the overwhelming weight of authority."

In *Adams v. Beloit,* 105 Wis., 363, 81 N. W., 869, 872, 47 L. R. A., 441, the Court said: "Option legislation upon proper subjects is now universally upheld, and declared to be general legislation, and not special legislation, nor to constitute a delegation of legislative power."

In *Cole v. Dorr,* 80 Kan., 257, 101 P., 1016, 1017, 22 L. R. A. (N. S.), 534, the Court said: "Even in jurisdictions where it is held that the taking effect of a Statute cannot be made to depend upon the result of a popular vote the principle is recognized that 'if an act in question is complete in itself, and requires nothing further to give it validity as a legislative act, it is not vulnerable to attack on constitutional grounds simply because the limits of its operation are made to depend upon a vote of the people.' "

In *Gordon v. State,* 46 Ohio St., 607, 23 N. E., 63, 66, 6 L. R. A., 749, the Court said: "In the exercise of the duties devolved upon the legislative branch of the state government, it is manifest that discretion and judgment are required, not only in determining the subject-matter of legislation, but

not unfrequently in ordering the conditions or contingencies upon which laws are to be carried into effect. It may be deemed expedient in one case to provide for preliminary action before a law is executed, which, under other circumstances, would not be adopted. In requiring such proceedings prior to the enforcement of a law, the legislature need not be prevented from keeping within the strict line of its authority. It is evident, we think, that the Act whose constitutional validity is called in question was a complete law when it had passed through the several stages of legislative enactment, and *derived none of its validity from a vote of the people*. In all its parts it is an expression of the will of the Legislature, and its execution is made dependent upon a condition prescribed by the legislative department of the state. By its terms, it was made to take effect from and after its passage. *The qualified electors derive their authority* to petition the trustees, *and the trustees obtain their authority* to order a special election, *directly from the Legislature*. The right of the electors to register their votes for or against the sale of intoxicating liquors is conferred by the same body."

"The rule is well established that a Statute does not delegate legislative power, so long as it is complete in itself, when it has passed the Legislature and has been approved by the Governor, *even though it is left to some local body to determine whether and when it shall go into operation.*" *State v. Tausick*, 64 Wash., 69, 116 P., 651, 656, 35 L. R. A. (N. S.), 807.

A study of the authorities has thoroughly convinced me that the application of the rule laid down in the second proposition of the proposed opinion does not establish the unconstitutionality of the Act in question, for the reason that the discretion as to which method of financing shall be followed is *essentially an administrative act and does not give the commission any authority to say what the law shall be*, The explicit language of this Court in the *Ruff case, supra*, permits no other conclusion: "In so far as the provision with

respect to the filing of 'consent' by the legislative delegation, the contingency upon the happening of which the law was to go into effect, confers any. authority or discretion on the persons designated, it is an authority or discretion as to the execution of the law and not as to what the law shall be."

To support the third proposition, reliance is placed especially upon the case of *Makris v. Superior Court,* 113 Wash., 296, 193 P., 845, 847, 12 A. L. R., 1428. That case, however, and numerous cases like it, relate to the regulation of the exercise of man's natural rights and simply mean that the exercise of such rights shall not be left to the uncontrolled discretion of any officer or board. The opinion itself, as shown in the proposed opinion here, lays down the rule which forms the basis of the decision to be that "it is sufficient to render a law or ordinance void in the light of these constitutional guaranties, if the prescribed manner of administering such law or ordinance results in leaving the question of the propriety of *issuing, withholding, or revoking a license to conduct an ordinary lawful business,* and thus the question of who may and who may not engage in such business, to the decision of any officer or set of officers, uncontrolled by any prescribed rule of action."

The note to this case at page 1436 of A. L. R., also quoted in the proposed opinion, specifically recognizes that the point involved is whether a Statute or ordinance which vests *arbitrary discretion with respect to an ordinarily lawful business, profession, appliance, etc., in public officials, without prescribing a uniform rule of action,* is unconstitutional and void. Even if it be conceded that such discretion is a grant of legislative power, still the rule would not control here, as in the present case the commission will not be called upon to deal with any similar question nor indeed is authorized to perform any act having the force of legislation.

In considering this objection as a whole it is well to hear in mind that "there is a constantly growing tendency toward

the delegation of greater powers by the Legislature and toward the approval of the practice by the Courts"; that while there is little disagreement as to the general principle governing the delegation of power by the Legislature, it is often difficult to draw the line and say whether delegated powers are or are not strictly and exclusively legislative; and that in every case before an Act of the Legislature is declared unconstitutional, such unconstitutionality must appear beyond a reasonable doubt.

It is clear, from an application of the principles announced by this and other Courts, that the objection urged against the constitutionality of the Act in question, in the particulars indicated, is without merit. There is no question here of alternative laws. There is but one law, with alternative plans of financing provided for the purpose of carrying out the law. The Act, as it came from the hands of the Legislature, is complete in itself in form and substance; it "embodies a full and complete expression of the legislative will," and became a law *in praesenti* upon its approval by the Governor. The Highway Commission is given no power to add to, or to take away from, the law as enacted, and nothing is left to the discretion of the commission as to what shall constitute the form or substance of the Statute. The basic subject matter of the Act is the completion of the construction of the State Highway System, and the two alternative plans of financing the work, each complete in itself, are merely parts of that subject. The authority conferred upon the commission, in the option given it to select either of the plans, is an authority or discretion as to the execution of the law, being merely a choice of a method of procedure for carrying out the purpose of the Act, and is nothing more than provision for efficient execution and administration of a finished Statute. This power is similar in principle to that which, as we have seen, has often been delegated to public officials or boards with the approval of the Courts.

IV. It is also contended that the Act is invalid as it undertakes to provide an appropriation of the proceeds of the gasoline tax and motor vehicle license fees for an indefinite number of years, in violation of Section 2 of Article 10 of the Constitution.

Under our form of government the Legislature is given plenary power in the matter of taxation, subject, of course, to express constitutional limitation. See Cooley's Constitutional Limitations (8th Ed.), page 986, *et seq*.

It has been held by this Court that with regard to appropriations the same extensive power exists, subject in like manner to constitutional limitations. In the case of *Briggs v. Greenville County, supra,* Mr. Justice Cothran, speaking for the Court, says:

"Are the provisions of the 'Pay-As-You-Go' Act which appropriate the funds out of which reimbursements are to be made under said reimbursement agreements in conflict with Section 2 of Article 10 of the Constitution of South Carolina, in that they appropriate money for more than one year?

"The power of the Legislature over the matter of appropriations is plenary, except as restricted by the Constitution. 36 Cyc., 891. In the absence of a constitutional prohibition, the Legislature may make continuing appropriations; that is, those the payment of which is to be continued beyond the term or session of the Legislature by which they are made. 36 Cyc., 893, 894; *In Re. Continuing Appropriations,* 18 Colo., 192, 32 P., 272; *Callaghan v. Boyce,* 17 Ariz., 433, 153 P., 733; *Fleckten v. Lamberton,* 69 Minn., 187, 72 N. W., 65; *People v. Pacheco,* 27 Cal., 175; *Jeffreys v. Huston,* 23 Idaho, 372, 129 P., 1065.

"*In Re. Continuing Appropriations, supra,* the Court said (pages 193, 194 [32 P., 272]):

" 'The power of the Legislature, except as otherwise restricted by the Constitution, is plenary over the entire sub-

ject. The power can, however, only be exercised subject to the provisions of Section 16 of Article 10 of the Constitution, by which appropriations in excess of the revenue are inhibited. * * * Under a similar provision with reference to appropriations to be found in the Federal Constitution, such continuing appropriations have been made by Congress, apparently without question, and it has been resorted to in this State, from the time of the inception of the State government. *When such appropriations are for the whole, or for a definite part of a certain special fund,* we are of the opinion that they furnish sufficient authority for the disbursement of such fund. * * * ' " (Italics added.)

As the appropriations contemplated by the Act under consideration relate to a "certain special fund," the gasoline tax and the motor vehicle license tax, the present case is clearly brought within the rule declared in the *Briggs case,* which settles the question adversely to the contention of the petitioners.

V. There is no merit in the contention (1) that the issuance of certificates of indebtedness or notes of the highway district to the amount authorized by the Act is in violation of Section 5 of Article 10 of the Constitution, limiting the amount of bonded debt of political subdivisions; or (2) that the provisions of the Act creating highway districts are in conflict with Section 5 of Article 10 and Section 34 of Article 3 and other sections of the Constitution which recognize and adopt certain kinds of political subdivisions for purposes of local government; or (3) that failure to provide opportunity for the taxpayer to be heard on the question of benefits to be derived from proposed improvements to his property amounts to a denial to the petitioners of due process of law and equal protection of the law under the State and Federal Constitutions; or (4) that the Act is violative of Section 5 of Article 1 of the State Constitution and the Fourteenth Amendment to the Federal Constitution, in that it provides an equal and uniform rate of taxation upon all

property in each of the districts without due regard to location, condition, and benefits to be derived therefrom, and will operate to work a disproportionate taxation, and a consequent probability of injustice, amounting to a denial to the petitioners of due process of law and equal protection of the law.

The questions here raised are decided adversely to the petitioners by the decisions in *Briggs v. Greenville County, supra,* and *Evans v. Beattie, supra.*

In connection with (4) : I cannot agree with the suggestion in the proposed opinion that the two-district plan is unjust and discriminatory in its operation. I find nothing in this plan that works any unfairness to any section. Material improvement is provided through a closely knit system of highways in the districts proposed. There will necessarily come to all sections of a district advantages and benefits from such local improvements. Mileage of roads is not the sole measure of benefits to a county. The extent of the general use by the people of any county of the highways to be constructed must be considered. The people of the more populous counties will necessarily use the highways constructed more than the people of the less populous, and in this way will derive the greater benefits from the improvements made. If it should be said that they pay more, the answer is that in the greater use of the highways built, they will receive greater benefits. *Evans v. Beattie.*

VI. Nor is there any merit in the contention that the issuance of certificates of indebtedness or notes as provided in the Act is in violation of Section 10 of Article 1 of the Constitution of the United States forbidding the emission of bills of credit.

It is clear, from an examination of this provision of the Act, that the evidences of indebtedness authorized by the Act are not "bills of credit," within the meaning of the Constitution of the United States. The "bills of credit" referred to in the Federal Constitution embrace only instruments that

are intended to circulate as money. *Houston, etc., Railway Company v. Texas,* 177 U. S., 86, 20 S. Ct., 545, 44 L. Ed., 683; *Poindexter v. Greenhow,* 114 U. S., 270, 5 S. Ct., 903, 29 L. Ed., 185.

There is nothing in the Act to indicate or to lead to the supposition that the bonds or certificates of indebtedness to be issued were intended to circulate as money. They are entirely different from the instruments considered in *State Ex Rel. Shiver v. Comptroller General,* 4 S. C., 185. The evidences of debt there issued were in forms of money, in small denominations and non-interest bearing.

VII. It is also urged that the Act is defective in that it does not contain any provision for the levy of a tax for a *sinking fund.*

It appears that Section 7 of Article 8 is the only provision in the Constitution with regard to a sinking fund, and it specifically relates to "cities and towns."

It is sufficient to say that no sinking fund is required for the retirement of obligations to be issued under this Act, as payments will be met from current funds. Moreover, "the special funds pledged for the payment of the proposed bonds * * * are really sinking funds." *Briggs v. Greenville County, supra.*

VIII. It is further urged that the Act is in conflict with Section 10 of Article 1 of the Constitution of the United States and Section 8 of Article 1 of the State Constitution, which forbid the enactment of laws impairing the obligation of contracts.

The contention is that the Act impairs the contractual obligation existing, at the time of its passage, between counties and highway districts on the one hand and holders of county or highway district bonds on the other hand, for the payment of which bonds the gasoline tax and the motor vehicle license tax had been pledged. This objection by the petitioners appears to be founded upon the proposition that the holders of these outstanding bonds and other obligations have a claim

upon the highway revenues derived from these sources, prior to all subsequent claims.

The Act itself requires the State Highway Commission to meet all of its outstanding reimbursement obligations, and also to pay interest on these obligations at the rate of $4\frac{1}{2}$ per cent. per annum or at such greater rate as is borne by bonds of counties or highway districts secured by a pledge of those reimbursement obligations. It is also required to pay all county, highway district, and bridge district obligations, secured by a pledge of that portion of the gasoline tax required by prior Acts to be distributed to counties.

While a decision of this question is not necessary here, no such bondholder being a party to the cause, I construe the Act before me to mean and to provide that, where such contractual obligation exists, the holder or holders of such outstanding bonds or other obligations have a claim upon such highway revenues pledged to secure their payment, prior to any and all subsequent claims thereto and thereon, created by or that may arise under the present Act. There is nothing in the Act inconsistent with such a construction, and I so construe it. *Board of Liquidation of New Orleans v. Louisiana,* 179 U. S., 622, 21 S. Ct., 263, 45 L. Ed., 347.

IX. It is urged with great earnestness that the Act also violates Sections 7 and 11 of Article 10 of the State Constitution. These sections are as follows:

"No scrip, certificate or other evidence of State indebtedness shall be issued except for the redemption of stock, bonds or other evidences of indebtedness previously issued, or for such debts as are expressly authorized in this Constitution."

"To the end that the public debt of South Carolina may not hereafter be increased without the due consideration and free consent of the people of the State, the General Assembly is hereby forbidden to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or otherwise, except for the ordinary and current business of the State without first submitting the ques-

tion as to the creation of such new debt, guaranty, endorsement or loan of its credit to the qualified electors of this State at a general State election; and unless two-thirds of the qualified electors of this State, voting on the question, shall be in favor of increasing the debt, guaranty, endorsement or loan of its credit, none shall be created or made. And any debt contracted by the State shall be by loan on State bonds, of amounts not less than fifty dollars each, bearing interest, payable not more than forty years after final passage of the law authorizing such debt. A correct registry of all such bonds shall be kept by the Treasurer in numerical order, so as to always exhibit the number and amount unpaid, and to whom severally made payable. And the General Assembly shall levy an annual tax sufficient to pay the annual interest on said bonds."

In each of the three cases under consideration it is contended as fatal to the enactment that it directs the creation of a new debt, an increase of the public debt, and the loan of the credit of the State without the free consent of two-thirds of the qualified electors thereof voting in favor of the issue.

In the case of *Hildebrand v. High School District,* 138 S. C., 445, 136 S. E., 757, 760, Mr. Justice Blease, in a very able and clear opinion, said: "The duty rests upon this Court to endeavor to harmonize not only legislative enactments with the Constitution, but the various provisions of the Constitution itself. The General Assembly is required, of course, to stay within the limitations of the Constitution in all of its legislation. While that body's construction of constitutional provisions, evidenced in its enactments, are not binding upon this Court, they will be given due consideration at all times."

So far as the question immediately under consideration is involved, the General Assembly, by way of *preamble* in this Act and recital of its understanding of the decisions of this Court has declared: *"Whereas,* The Supreme Court of South Carolina has held a number of times that county, city and

district obligations, of the same character as the obligations hereinafter authorized, secured by a *special fund which may reasonably be expected to be sufficient to meet the payment of the obligations without resorting to a property tax,* do not constitute debts within the meaning of the constitutional restriction upon the amount or method of incurring debt, notwithstanding that the full faith, credit and taxing power of a county, city or district are pledged for the payment of the obligation." (Italics added.)

In this connection, in construing the constitutional restrictions upon the creation of a State debt (Sections 7 and 11 of Article 10), I shall also consider the restrictions in the Constitution relating to the creation of debts of political subdivisions (Section 7 of Article 8 and Section 5 of Article 10). It will be noted, from a reading of these sections, that the provisions relating to the State apply to "debt" and "indebtedness," while the provisions relating to political subdivisions apply only to "bonded debt" or "bonded indebtedness."

With respect to the provisions relating to State debt, the answer to the question under consideration depends upon the meaning of the words "debt" and "indebtedness" as used in Sections 7 and 11 of Article 10. The definitions of the word "debt" are many, and depend on the context and the general subject with reference to which it is used. 17 C. J., 1371. Its meaning in the constitutional provisions before us must be determined by their purpose, which was "that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation." *Briggs v. Greenville County, supra.* In many cases, and in many states, obligations of various kinds, constituting debts in the ordinary sense of the term, have been held not to be debts within the meaning of similar constitutional provisions.

The only decision of this Court construing the restrictions upon the creation of a State debt which seems to throw any light upon the present problem is the decision in the *Briggs*

*case,* upholding reimbursement agreements. In that case it was held that the State's indebtedness to a county or road district under a reimbursement agreement, being payable exclusively from a special fund derived from sources other than a general property tax, was not within the meaning of the constitutional provisions relating to creations of debts of the State. Mr. Justice Cothran, who wrote the opinion of the Court, said:

"The proposed reimbursement agreements will not constitute a general liability of the State. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and Federal aid. No property tax can ever be levied to meet these obligations.

"Is such a limited liability a debt of the State in the constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of State debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation. This purpose will not be defeated if it should be held by this Court that a debt for the construction of a State highway system, payable exclusively from Federal aid moneys and special license taxes to be borne by the persons who will derive the principal benefits from the State Highway System, is not a debt of the kind required by the Constitution to be approved by the voters of the State before it is incurred. According to the weight of authority in other States, such a debt does not fall within the terms of such a constitutional provision."

It would seem, by parity of reasoning, as the Court held "such a debt does not fall within the terms of such a constitutional provision," that a submission of such question, under the State unit plan of financing, to the qualified electors, is not required.

But whatever doubt may be thought as to the holding of this Court with respect to provisions relating to the creation of a State debt, there is no uncertainty as to

the tenor of its decisions dealing with constitutional restrictions upon the creation of a "bonded indebtedness" of political subdivisions. The leading decisions of this class are the *Evans* and *Briggs cases, supra,* the opinion in the former being filed October 15, 1926, and the opinion in the latter three days later. The Court discussed at great length in these cases, and in language almost the same in both, the meaning and effect of the constitutional restrictions on the creation of indebtedness of political subdivisions. Both of these cases were vigorously contested, and the validity of the Statute involved in each of them was challenged on many constitutional grounds. Unusual study and consideration were given to both cases on account of the gravity and importance of the questions raised; the opinions in both of them were written by that learned and careful jurist, Mr. Justice Cothran, and concurred in by the entire Court. Many of the questions raised in the former case were also involved in the decision of the latter. The Court, as indicating that it recognized the grave issues raised demanded its most careful consideration, said:

"The matter is now before us for decision upon the petition and return and upon exceedingly full and illuminating briefs of counsel, which demonstrate the fact that this is not a 'friendly suit' to insure the validation of the Coastal Highway Act, but a genuine and earnest contest over the provisions of that Act; as counsel for the petitioners very aptly describe the situation:

" 'Here the citizen's claim of fundamental right under government, is to be weighed against the claim of lawful community enterprise and development. The grave issue ought to compel care and dignity in presentation as the only fitting aid to true and just judgment.'

"In that spirit we approach the discussion and decision of the many points involved."

On the question here involved, Mr. Justice Cothran wrote learnedly and elaborately, as follows:

"This Court has held a number of times that obligations of the same character as these bonds, secured by the pledge of a fund which might reasonably be expected to be sufficient to meet the obligations without resorting to the levy of a property tax, did not constitute bonded debt within the meaning of the constitutional limitations, notwithstanding that the full faith, credit, and taxing power of a political subdivision were pledged for the payment of the obligations. *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421; *Brownlee v. Brook,* 107 S. C., 230, 92 S. E., 477; *McIntyre v. Rogers,* 123 S. C., 334, 116 S. E., 277; *Barnwell v. Matthews,* 132 S. C., 314, 128 S. E., 712; *Sullivan v. City Council of Charleston,* 133 S. C., 189, 133 S. E., 340. In each of these cases the obligations passed upon undoubtedly constituted a debt, in the technical and legal sense of that term, of a political subdivision, a debt payable in future years, evidenced by instruments designated as bonds or having all of the characteristics of bonds. In all but one of the cases the obligations were designated, 'certificates of indebtedness,' rather than 'bonds,' but the decisions were not placed upon the ground that a certificate of indebtedness is not a bond. Indeed, in the recent case of *Sullivan v. City Council of Charleston,* 133 S. C., 156, 130 S. E., 873 (decided on the same day as the case with the same title cited above), it was held that notes which were bonds in everything but name should be deemed to be bonds within the meaning of the constitutional limitations. See, also, *Denver v. Home Savings Bank,* 236 U. S., 101, 35 S. Ct., 265, 59 L. Ed., 485.

. "In one of the cases (*Lillard v. Melton*) the obligations were secured by the income of a canal company. In three of the cases (*Lillard v. Melton, Brownlee v. Brock,* and *McIntyre v. Rogers*) the obligations were secured by special assessments levied upon property benefited by street improvements and payable in annual installments. In one case (*Sullivan v. City Council of Charleston*) the obligations were secured by past-due and unpaid taxes. In another case (*Barn-*

*well v. Matthews*) they were secured, as in the present case, by a reimbursement agreement made pursuant to the 'Pay-As-You-Go' Act. In reliance upon the decisions in these five cases, millions of dollars of county and city obligations have been issued and are now outstanding.

"The present case cannot be distinguished upon the ground that these bonds are 'direct and general obligations' of a political subdivision, 'payable primarily' from a property tax. This will be seen from the following review of the cases:

"In *Lillard v. Melton, supra,* it was held that interest coupons of bonds issued by a corporation known as the 'Board of Trustees of the Columbia Canal' did not constitute bonded debt of the City of Columbia within the meaning of Section 5 of Article 10 of the Constitution, notwithstanding that the city was primarily liable for the payment of the coupons. The statutes under which the bonds were issued (19 Stat., 1090, 1097, approved December 24, 1887), provided that payment of the coupons should be 'guaranteed' by the city; that 'said board of trustees shall, after the year 1893, pay the interest on said bonds each and every year, if practicable for them to do so'; that the city 'shall be authorized and required to levy such a tax on the real and personal property assessed for taxation in the City of Columbia as may be necessary to pay the coupons * * * for the year A. D. 1888, and shall annually thereafter levy a tax sufficient to pay the coupons as they mature on said bonds, and shall pay the same: Provided, that after the year 1893 the board of trustees of the Columbia Canal shall pay over semiannually to the City of Columbia' all of the net income of the corporation, 'not exceeding in any one year the amount of the coupons maturing'; that the city's 'guaranty' should be written on the bonds as follows: 'The City of Columbia, S. C., guarantees the prompt payment of each and every coupon attached to this bond'; and that the coupons should be payable at the city treasurer's office. It is clear from these provisions that the city's liability was primary and direct. The city was required to pay the coupons, and to

levy a sufficient annual tax for that purpose, which tax was doubtless to be reduced, however, by the amount of moneys received from the canal corporation. The primary fund for the payment of the coupons was the city tax.

"In the same case 'certificates of indebtedness' issued by and guaranteed by the City of Columbia pursuant to 28 Stat., 585, were held to be not a part of the city's bonded debt within the meaning of the constitutional limitations. The statute authorizing the issuance of the certificates contained the following recitals: That the city had assessed a part of the cost of certain street improvements upon abutting property owners; that the city desired 'to issue certificates of indebtedness showing amounts due to said city by said property owners as deferred payments upon such assessments for the purpose of realizing money upon such certificates by either selling the same or borrowing money thereon'; that 'the property so assessed is bound to said city for the payment of the deferred portions of such assessments, and such certificates of indebtedness do not constitute in reality debts against the city, but merely evidence debts due to the city, and the existence of said lien on said property will fully protect said city against loss upon guaranty of· such certificates of indebtedness entered into by said city.' These recitals were followed by a grant of authority to the city 'to sell any such certificates of indebtedness which may hereafter be issued by said city,   *   *   *   or to borrow money upon such certificates of indebtedness, and to pledge such certificates as collateral security for the payment of such debts, and, in either event, to guarantee the payment of such certificates according to the terms thereof, and to pledge the faith and credit of the city for the payment thereof.' The record in the case shows that the certificates of indebtedness had fixed dates of maturity extending over a period of several years. Apparently, the certificates were intended to be assignments of the assessments. However that may be, it is clear that the city at least made an absolute guaranty of payment, under which it would become primarily liable at the

maturity of the certificates for the payment of the amount thereof, and that the city's faith and credit were pledged for such payment.

"The Court did not, in *Lillard v. Melton*, discuss at length the grounds for its decision that the obligation of the City of Columbia on the interest coupons and paving certificates above described should not be included as a part of the bonded debt of the City of Columbia within the meaning of the constitutional limitations. The Court merely said (103 S. C., 10, 19, 87 S. E., 421, at page 425):

" 'Likewise, the liability of the city on the guarantee of the paving assessments and the interest on the canal bonds constitute but a contingent obligation and must be excluded.'

"In *Brownlee v. Brock, supra,* and in *McIntyre v. Rogers, supra,* paving certificates similar to those we have described were held, without a discussion, to be exempt from the constitutional limitations upon bonded debt, upon the authority of *Lillard v. Melton.* In *Barnwell v. Matthews, supra,* the facts were as follows: Act No. 348 of 1925 (34 Stat. at Large 723, approved April 1, 1925), authorized Florence County to issue its 'notes' in the amount of $225,000, maturing in three annual installments of $75,000 each, beginning four years after the date of the notes. Of the proceeds of the notes $205,000 were to be used for the construction of two roads embraced in the State Highway System and designated in Section 1 of the Pay-As-You-Go Act; and $20,000 of the proceeds were to be used for the construction of a road which had not yet become a part of the State Highway System. The Act directed the county to pledge as security for the payment of the notes 'all surplus tolls arising from the operation of the Mars Bluff bridge and all tolls that may be derived from Godfrey's ferry bridge, which shall accrue to Florence County,' and also 'all reimbursements due from the State Highway Commission,' except reimbursements to be paid during the years 1925, 1926, and 1927. The Act further provided as follows (Section 3):

" 'The full faith and credit and taxing powers of Florence County are hereby irrevocably pledged for the payment of said notes, and the auditor of Florence County is hereby authorized and directed to make a sufficient levy to pay the interest and installments on said notes, but said levy shall be suspended in case the tolls and reimbursements above mentioned are sufficient to pay said interest and installments of said notes as they become due.'

"The Circuit Court held that the notes were not subject to the constitutional limitations on bonded debt. The judgment of the Circuit Court was affirmed, without opinion. The grounds for the decision are stated in the judgment of the Circuit Court as follows:

" 'In the instant case the Legislature has authorized the issuance of obligations to be secured primarily by bridge tolls and highway reimbursements, the work performed with the funds derived from the notes being work specifically designated by statute as that of the State Highway Department, and for which the taxpayer is never to be liable unless the resources pledged fail, and has declared in express language that such obligations are notes. * * * It is perhaps unfortunate that the Constitution is not more explicit in defining the term "bonded debt," but be that as it may,'I feel satisfied that whatever other elements may be necessary to make up a bonded debt, certainly one of the most essential is that it must be a primary obligation of the political subdivision involved, and secured primarily by a tax levied on the property holders therein. From the facts pleaded in the affirmative defense and admitted by the demurrer, this essential element is wanting in these obligations. They * * * secure funds borrowed for the building of roads of the state-wide system of public roads. The Act providing for the building of such roads expressly declares, in Section 1 thereof, that they "shall be constructed by the State of South Carolina and ever maintained as State highways." It is true Section 6 of the same Act permits a county to build any roads of such system and to

be reimbursed therefor by the State, but this in no way changes the fundamental purpose of the Act, which was to charge the State with the duty of constructing such roads and to impose upon it the corresponding obligation of paying for them. The Act of April 1, 1925, makes explicit provision for two of the designated highways of the "Pay-As-You-Go Act," and authorizes the expenditure of $205,000 thereon. As to these it is too clear for argument that the county is only contingently liable, and in fact I am constrained to hold a taxpayer to the county can never be required to pay any part of such amount as the State would be legally bound to discharge such obligations without permitting such action against taxpayers to the county. .

" 'Under the facts and the law, therefore, the proposed notes to the extent of $205,000 are nothing more than guaranties or other contingent obligations of the county; and in no sense do they constitute a bonded debt thereof. The case therefore falls squarely within the decision of *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421, and must be controlled by it. While the additional $20,000 authorized to be issued is not to be used in the construction of a road already designated as a part of the State System, yet the demurrer admits that it is to become a part of such system. This being true, the notes representing it are governed by the same principle as apply to those to be issued for the other two roads.'

"In *Sullivan v. City Council of Charleston,* 133 S. C., 189, 133 S. E., 340, the last of the five cases above referred to, the facts were as follows: The city had on its books over $300,000 of uncollected taxes, levied in the years 1921, 1922, 1923, and 1924. On March 14, 1925, there was enacted a statute, 'Act No. 298 of 1925 (34 Stat. at Large, 661), which provided as follows:

" 'The city council of Charleston [the corporate name of the city], Charleston County, is hereby authorized and empowered from time to time to issue its certificates evidencing the amount of taxes or portions thereof which may have been

levied against property in the City of Charleston, Charleston County, S. C., and which are past due and unpaid, and to sell, hypothecate or pledge said certificates, and upon such sale, hypothecation or pledge to assign the same and to guarantee in the name of the city council of Charleston to the holder thereof the payment of the indebtedness evidenced thereby, at a place and time designated in such guaranty: Provided, however, that when the taxes evidenced by said certificates are collected, they shall be applied solely to the retirement of the same until all of said certificates are retired in full; and, provided, further that in the event, at any time, sufficient of the said due and unpaid taxes have not been collected to meet the payment, to the holder of such certificates of the amount which is to be paid under the guaranty indorsed on said certificates at the time such guaranty provides for payment, the city council of Charleston shall forthwith levy and collect a tax upon all taxable property in the City of Charleston, which, added to the collections made on such due and unpaid taxes, will make a sum sufficient to meet the payment of the amount due on the certificates then maturing; such certificates shall have attached to them interest coupons certifying that the city council of Charleston will pay to the holder thereof the amount of interest therein stated, which interest shall be fixed by city council in the ordinance authorizing the issuance of said certificates, and to meet the payment of said interest there shall be included in the general tax levy of each year in which such interest is due, as a part of the ordinary expenses of city council, a sufficient tax to meet the payment thereof. The guaranty of city council indorsed on said certificates shall provide the date on which the holder of said certificates may require payment thereof, and such time shall be fixed as in the opinion of city council it is probable that the collection of said due and unpaid taxes will enable the same to be paid.'

"In a suit instituted by petition of a taxpayer, it was contended that the issuance of these certificates created a bonded

debt in the meaning of the 8 per cent. constitutional limita-
tion and would be in violation of the Constitution, the exist-
ing bonded debt of the city being then up to 8 per cent. limit.
In disposing of this contention, the Court merely said:

" 'The contention of the petitioner is untenable under
* '* * *  *Barnwell v. Matthews et al.* [132 S. C., 314], 128
S. E., 712.'

"The guaranty of the City of Charleston of the certificates
of indebtedness was an absolute guaranty of payment, upon
which the city would become primarily liable at the time
of the maturity of the certificates. The holder of a certificate
would not, in the event of nonpayment of the certificates at
maturity, have to look to the past-due and unpaid taxes upon
which the certificates were predicated. Moreover, it appears
from the Act that the city could, 'in the event, at any time,
sufficient of the said due and unpaid taxes have not been
collected to meet the payment  *  *  *  at the time such
guaranty provides for payment,  *  *  *  forthwith levy
and collect a tax' to pay the certificates; *i. e.,* the city could,
if it foresaw an insufficiency in the collections of back taxes,
levy the new tax prior to the time of maturity of the certif-
icates. It is noteworthy also that the interest on the certif-
icates was to be paid out of a new tax. Furthermore, we wish
to call attention to the provision in the Act directing the
city to make the certificates payable at such time as in the
opinion of the city it was probable that the collection of the
back taxes would enable the city to pay the certificates.
Similar provisions are to be found in the Coastal Highway
Act. This case was decided by the Court *en banc,* and under
the provisions of the Constitution its decision is 'final and
conclusive.'

"From the foregoing review of the decisions, it is obvious
that the present case cannot be distinguished from the
previous cases upon the ground that the obligations here in
question are payable primarily out of an *ad valorem* tax, if
the Coastal Highway Act had not made such a provision for
payment, but had required the holders of the proposed bonds

to look first to the reimbursement moneys and gasoline tax, and required the district or counties to exhaust their remedies against the State Highway Commission or the state treasurer before resort could be had to the levy of a property tax in order to meet the bonds, the bonds would be unsalable, or they would have to be sold on such a high interest basis as to make the cost of the financing excessive."

The principle stated in the first sentence of the foregoing extract was adopted by the Court as the controlling principle of its decision. In both cases it was held that *county* bonds, secured by the pledge of a special fund which might reasonably be expected to be sufficient to pay the obligations without resorting to the levy of a general property tax—the fund referred to being derived from the same sources as the special fund provided for the payment of the obligations in the instant case—did not constitute bonded debt within the meaning of the constitutional restrictions upon the creation of "bonded debt" of counties, notwithstanding that the bonds were "direct and general obligations" of the counties, "payable primarily" from a general property tax, rather than from the special fund, and the "full faith, credit and taxing power" of a county or counties were pledged for the payment of the bonds. In both cases the same principle was applied to bonds of a highway district. The statutes involved authorized the issuance of bonds either in the name of a highway district on the one hand or in the name of a county or group of counties on the other hand, as the local officers might in their discretion determine.

It is true that the decision in regard to highway district bonds might have been reached solely upon an entirely different ground, namely, that a property tax levied for the payment of obligations of a highway district is a special assessment, as distinguished from a general property tax, and bonds payable exclusively out of special assessments or other funds derived from sources other than a general property tax do not constitute debt within the meaning of the constitutional restrictions (*Jackson v. Breeland*, 103 S. C.,

184, 88 S. E., 128; *Rutledge v. Greater Greenville Sewer District,* 139 S. C., 188, 137 S. E., 597), but this additional ground for the ruling concerning district obligations is not mentioned in the *Greenville case.* In that case the doctrine announced in the *Coastal Highway case* was reaffirmed in the same language used in the latter case, and upon the doctrine therein announced as to this question, the Court rested its decision. Nor would the doctrine furnish any support for the ruling concerning *county obligations* in the *Coastal Highway case; (Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538) and, as I have stated, the same principle was applied therein to bonds issued by a highway district as to those issued by a county or a group of counties. A decision as to the district bonds proposed to be issued in this case may also be rested solely upon that ground.

In the proposed opinion it is also stated that this doctrine "should be disapproved for the reason that it is erroneous." A number of decisions from other jurisdictions are cited and quoted from to sustain this proposition.

It is evident that only by complete repudiation of the former holding of this Court can the Act in question be declared unconstitutional; and I, for one, am not prepared, without urgent reasons or clear manifestation of error, to abandon a doctrine or principle declared by this Court to be sound and the law of this jurisdiction, and to substitute therefor the decisions of the Courts of other jurisdictions, which, though deserving of respect, are in no way binding upon us. The decisions in the *Evans* and *Briggs cases* were not arrived at over night, but were the result of many weeks of careful study, investigation, and consideration. The validity of the statute in each of these cases was assailed by able counsel representing the petitioners, and the Court, as said, reached its decision after careful thought and mature deliberation. The learned justice who wrote the opinion in the *Coastal Highway case* also wrote the opinion in the *Greenville County case.* In the *Coastal Highway case* he announced the doctrine here objected to, basing his conclusions upon the

holdings of this Court in several of its prior decisions, which, according to the view taken in the *Coastal Highway case,* settled conclusively the question there raised. Not only that. As showing that the position taken was sound, and in accord with previous declarations of this Court, he made an exhaustive analysis and review of the cases cited, and concluded at the end of that review that it was obvious from these decisions that the *Coastal Highway case* could not be distinquished from them in principle. In addition, at the same time the Court had under consideration the *Greenville County case,* involving many of the same grave constitutional questions raised in the *Coastal Highway case,* including the one now being considered here. After a most learned and elaborate discussion of this question, using practically the same language as in the *Coastal Highway case,* the same learned justice again affirmed the doctrine stated in the *Coastal Highway case,* declaring it to be sound and the law of this jurisdiction, as had been adjudicated by a number of previous decisions of this Court. In both of these opinions, as I have stated, all the members of the Court concurred.

And even as late as August 25, 1927, this Court in a unanimous opinion, in the case of *Thomson v. Christopher,* 141 S. C., 92, 139 S. E., 178, 180, referred with approval to the doctrine stated in the *Evans* and *Briggs cases:* "It has been held in several cases in this State that the obligations of a political subdivision which are merely guaranties or other contingent obligations of the subdivision or are secured by the pledge of a fund which might reasonably be expected to be sufficient to meet the obligations without resort to a property tax would not constitute bonded debt within the meaning of the Constitutional limitation, notwithstanding that the full faith, credit and taxing power of the subdivision were pledged for the payment of the obligations. *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153, and cases cited; *Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538, and cases cited."

Every decision of this Court which has been brought to my attention, having to do with the constitutionality of a bond issue for improvement and construction, and involving the question here under consideration, is in accord with the principle stated in the *Briggs* and *Evans cases*. Since the decisions in those cases, and in reliance on them, approximately $30,000,000 additional county and district obligations have been issued and are now outstanding. All of these millions of county and district bonds are secured by the obligation of the State to repay the counties and districts out of the public moneys to be collected in future years from license fees and gasoline taxes.

To open the clear declarations of this Court to doubt or question, after these millions of bonds have been issued in the State in reliance, as pointed out, upon these decisions, would seem almost inconceivable; and I do not think that this Court can afford, by a mere wave of the hand, to declare "erroneous" its solemn adjudication in relation to a grave constitutional question, the ink being yet scarcely dry upon the paper, with no "urgent reasons" or "clear manifestation of error," upon the unstable grounds that the principle or doctrine announced is not, perhaps, in full accord with a few decisions of other jurisdictions. As said in *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421, 427: "Since the decision in the case of *Carrison v. Kershaw County, supra* [83 S. C., 88, 64 S. E., 1018] the Legislature, evidently viewing the solemn adjudication of this Court as a determination of its powers in such cases has enacted a great many measures providing for bond issues without the prerequisite of a submission of the question to a vote of the electors. A contrary conclusion at this time would, indeed, be unfortunate in its effect upon the valuable rights which have been acquired in good faith and in reliance upon that decision. Cooley's Cons. Lim., pp. 81, 82. When a principle is once adopted and declared by the Courts, the people have a right to regard it as just declaration of the law, and to regulate their actions and contracts thereby. *Id.,* pp. 83, 84.

There should never be a disturbance of the same, except upon urgent reasons and a clear manifestation of error. *Id.,* 84.".

The following from *State v. Frear,* 142 Wis., 320, 125 N. W., 961, 964, 20 Ann. Cas., 633, is in point: "Decisions on constitutional questions that have long been considered the settled law of the State should not be lightly set aside, although this Court as presently constituted might reach a different conclusion if the proposition were an original one. As is said in *Fisher v. Mfg. Co.,* 10 Wis., 351, 355: 'It is the duty of this branch of the government to pass finally upon the construction of a law, and determine whether the Legislature in its action has transcended its constitutional limits, and the community has a right to expect, with confidence, we will adhere to decisions made after full argument and upon due consideration.'"

X. The proposed opinion refers to the "district unit plan of financing" as a "subterfuge," and suggests that "it was devised to circumvent the constitutional inhibition; to avoid the necessity of submitting the issue to a popular vote as required by the Constitution."

For a clear understanding of the provisions of the Act and the causes that moved the Legislature to put it in the form in which it came from the hands of that body, some information concerning prior legislation relating to the financing of the State Highway System is necessary.

Under the law in force at the time of the passage of the Pay-As-You-Go Act of March 21, 1924 (33 St. at Large, p. 1193), the State Highway Commission, with the consent and co-operation of the local road authorities of the several counties, had created a more or less loosely connected system of highways. By the Act of 1924 these highways were incorporated, along with other highways authorized and instructed to be maintained into a closely knit state highway system created by the Act, and the State Highway Department was charged with the maintenance and construction of these roads. It was provided by the Act, as amended, that

such maintenance and construction should be by means of a fund consisting of federal aid money, the motor vehicle license tax, and three-fifths of the 5-cent gasoline tax. The commission estimated that these revenues would be sufficient to complete the entire system within 18 years from and after the year 1924, and made numerous agreements for reimbursements within that period. Owing to the fact that many miles of highways were added to the system by subsequent legislation, the commission found it necessary to make a new estimate of the time required for the completion of the work.

Under Acts of 1926 and 1927, county and district bonds were issued on the faith of these highway revenues. These Acts created a state obligation to collect the gasoline and license taxes and to pay over to each county or road district the proportionate share of such taxes pledged to the retirement of the respective county or district bonds, and the Court recognized the legality of legislative action to create state obligations of this kind (*Briggs v. Greenville County; Evans v. Beattie*). Advances of money were made to the state which called for repayment by the state out of those yearly revenues, of which a continuing appropriation was made by the Legislature. The county bond plan, with its extension to a few scattered districts, while materially aiding construction in different sections of the State, was not adapted to finish a state-wide connected system of improved highways.

The situation is well presented in the preamble to the present Act: "The great progress made in the building of the State Highway System of South Carolina has been made, not by adhering to a 'Pay-As-You-Go' policy, but by issuing bonds or other obligations in the name of counties or highway districts, backed by reimbursement agreements with the State Highway Commission, and this method of financing is no longer adequate because a majority of the counties are unable to pay interest on any further bond issues out of their share of the gasoline tax, and therefore the rate

of progress in highway construction and the rate of increase in revenues received from the users of highways will be greatly reduced unless a new plan of financing is adopted."

The inability of so many counties to pay the interest referred to out of the 2-cent gasoline tax distributed to them was, of course, due to the fact that such distribution was made on the basis of motor vehicle license tax collections, rather than on the basis of mileage or cost of construction of state highways, in the several counties. Owing to this inability, many counties could not issue bonds under the reimbursement plan, and many of the most important highways in the State Highway System were left to be constructed in the distant future under the so-called "Pay-As-You-Go" plan of financing.

Under these circumstances, when the Legislature assembled in 1929 it attempted to meet the situation through the enactment of legislation providing some acceptable plan of financing the completion of the construction of the State Highway System throughout all the counties within a reasonable time.

It first satisfied itself of the sufficiency for this purpose of the gasoline tax and the license fees to be collected during a period of years. In the preamble it is declared: "The State Highway Commission has made a conservative estimate of revenues and liberal estimate of expenses, from which it appears that the revenues to be derived annually during the next twenty-four years from the gasoline tax and the motor vehicle license fees will be sufficient, without resorting to a property tax, to pay the sums required annually for: (a) interest payments on a State loan sufficient in amount to complete the State Highway System immediately; (b) sinking fund and serial payments for retiring the principal of such a loan within twenty-four years from the present time; (c) administration and operation of the State Highway Department; (d) maintenance of the entire State Highway System according to the most approved standards; (e) full compliance with all existing obligations

of the State Highway Commission to reimburse counties or highway districts for constructing State highways or for advancing moneys for that purpose; (f) payment of interest on these reimbursement obligations at the rate of four and one-half per centum per annum, or, in cases where this would be less than the interest payable on outstanding county or highway district bonds or other obligations issued since the passage of the 'Pay-As-You-Go' Act for the construction of State highways, payment of interest on such bonds or other obligations, and: (g) to produce an annual surplus for the construction of additional State highways and for eventually maintaining county roads."

Also, properly desiring to keep any legislative enactment within constitutional limitations, the Legislature proceeded to inform itself as to the holdings of this Court with respect to such limitations, as appears from a portion of the preamble already quoted. Recognizing that the credit of the State is better than the credit of any of its political subdivisions, it proposed and adopted a state plan of financing, involving the use of the gasoline tax and license fees as a special fund, and the creation of a road district coterminous with the State itself, with the full faith, credit, and taxing power of the State pledged for the payment of the obligations to be issued. The Legislature, under the decisions of this Court, had grounds for believing that such a plan was constitutional.

About the question, however, of the legality of the issuance of such obligations without a vote of the electors, although the same in principle as that involved in the district plan decisions, the Legislature appeared to have had some doubt. So, in order to meet the contingency that would arise if such a plan should be held unconstitutional by this Court, the legislators, as good business men, having at heart the best interest of the State in the accomplishment of the thing sought to be done, provided as an alternative a two-district plan of financing; and, in so doing, followed the path blazed out by this Court, relying upon the fundamental soundness

of the principles declared in its decisions. About the constitutionality of the "district unit plan of financing," there could be no doubt; and if, in following the chart of our judicial decisions, the Legislature brought itself "within the sheltering wings of the coastal highway and other district cases, decided by this Court," can it be said that it had no right, in order to assure the constitutionality of the Act, to rely upon such fundamental utterances, or that in relying upon them, it resorted to subterfuge and is chargeable with an attempt to evade the Constitution? I think not.

In Cooley's Constitutional Limitations (8th Ed.), on page 375, it is said: "The constitutionality of the law, then, is to be presumed, because the Legislature, which was first required to pass upon the question, acting as they must be deemed to have acted, with integrity, and with a just desire to keep within the restrictions laid by the Constitution upon their action, have adjudged that it is so."

The members of the Legislature must act upon their own initiative and their own best judgment. They cannot obtain the opinion of this Court in advance, as to the constitutionality of any proposed law. But in this case they had, and were entitled to rely upon, the declaration of fundamental principles announced by this Court in the consideration of the effect of constitutional limitations on similar bonds issued by counties and highway districts for the same purposes of highway improvement.

Mr. Justice Blease, in the *Hildebrand case,* said: "The fact, however, that the lawmaking body, with the purpose in view of observing strictly constitutional provisions, and, *to that end, exercises great precaution to make one of its Acts come clearly within any possible construction of the Constitution, should not avail to defeat the real intention of the legislation."*

Again I refer to Cooley's Constitutional Limitations (8th Ed.), p. 375, to see what weight a decision of such character should have upon the legislative mind: "As to what the doubt shall be upon which the Court is to act, we conceive

that it can make no difference whether it springs from an endeavor to arrive at the true interpretation of the Constitution, or from a consideration of the law after the meaning of the Constitution has been judicially determined * * * since it is but reasonable to expect that, where a construction has once been placed upon a constitutional provision, it will be followed afterwards, even though its original adoption may have sprung from deference to legislative action rather than from settled convictions in the judicial mind."

A fair consideration of the facts existing at the time of the passage of the Act in question must lead to the conclusion that the Legislature, in its enactment of the statute, proceeded with proper caution and circumspection and with a full appreciation of the grave responsibility resting upon it. As I view the entire situation that confronted the members of the Legislature—the history of highway legislation, the purpose to be accomplished, and the decisions of this Court with regard to grave constitutional questions that might affect the validity of the Act—what they did was but a proper exercise of precaution to bring the Act within any possible construction of the Constitution, to assure the accomplishment of the primary purpose of the law; and, as said in the *Hildebrand case,* such precaution "should not avail to defeat the intention of the Legislature."

On the whole, I have given to the issues involved the careful consideration which their importance deserved, and have expressed my views, it is to be hoped, at not too great length. In my study of the case, the well-prepared arguments of counsel, both for the petitioners and for the respondents, have been very helpful; and, in the preparation of this opinion, I have made such use of their form and substance as I deemed proper.

The judgment of this Court is that the Act in question, including all of its articles, sections, provisions, sentences, and clauses, be and is hereby declared constitutional and valid, and of full force and effect, and that, the injunction

prayed for, in each of the said cases, be denied and the petition dismissed.

And it is so ordered.

NOTE.—Since the preparation of the foregoing opinion, certain statements with regard to the Legislature, then appearing in the proposed opinion of the Chief Justice, have been expunged therefrom; and this note is here inserted to explain and clarify certain references made in my opinion to such statements.

MR. JUSTICE CARTER and MESSRS. CIRCUIT JUDGES WILSON, SHIPP, SEASE, RICE, MAULDIN, DENNIS, JOHNSON, GRIMBALL and RAMAGE concur in the foregoing opinion.

MESSRS. CIRCUIT JUDGES FEATHERSTONE and MANN: We are clearly of the opinion that the two-district plan is constitutional.

We have a doubt as to the constitutionality of the State unit plan, but yielding to the opinion of the majority of our brethren, we resolve the doubt in favor of the constitutionality of the entire Act.

MR. CHIEF JUSTICE WATTS (dissenting) : These three cases involve the validity of an Act of the General Assembly, approved March 14, 1929, known as the State Highway Bond Act. In each case application is made to this Court in its original jurisdiction, by one or more taxpayers in their own names or in the name of the State to enjoin certain state officers from carrying out the provisions of the Act and to have the Act declared unconstitutional, null, and void. The cases, involving practically the same issues, were heard together and will be so decided. They involve no questions of fact.

The Court is sensible of, and responsive to, the principle that, when asked to declare a solemn enactment of the General Assembly, a co-ordinate branch of the government, invalid by reason of its unconstitutionality, a conclusion to that effect should be so manifest as to be beyond a reason-

able doubt. *Wingfield v. Tax Commission*, 147 S. C., 122, 144 S. E., 846.

The attitude of the Court is forcibly expressed by Mr. Justice Evans, of the Supreme Court of Iowa, in the case of *State v. Executive Council* (Iowa), 223 N. W., 737, 743, thus: "To shatter, by judicial decision, the painstaking labor of years of these great departments, carries to the onlooker an ungracious aspect. The responsibility thus facing us is one not of our seeking, nor of our liking, nor yet one which we would dare evade. We are assured, too, that in the long event the duty we owe, not only to the litigants, but to our co-ordinate departments of government, is to undertake frankly the judicial responsibility which litigation casts upon us, and to declare faithfully our judicial convictions therein. In such a case our primary concern is, and must be, directed to the soundness of our conclusion, and not to its consequences. Consequences are inevitable in every litigation and are commensurate with the magnitude thereof. They are not judicially made, nor can we make them less or more. It is not given to the Judge to look to consequences for guide in decision. If he does so, he is looking for light where none is. Indeed, he has thereby entered a dark room, and becomes as one groping, with his fingers upon the wall. The Judge cannot know, if he would, the ultimate consequences of his decision. If the decision be truly sound, he may safely dare to trust the sequence of future events, early or late, to justify it."

It is plain, from the terms of the Act, that on account of the fact that "under the plan of financing provided by existing laws, the construction of the State Highway System cannot be completed in less than *twenty-one years*" (see the first "whereas" to the Act), the General Assembly, fretting over this enforced delay, determined to speed up the completion of the construction, by authorizing the issue of certificates in the amount of $65,000,000, the proceeds of the sale of which were to be available in a little more than *three years.*

They were confronted by the bar of the Constitution from authorizing the issue of the certificates without a submission of the issue to a popular vote, Article 10, § 11; they saw a gleam of hope in the decisions of this Court validating bonds issued by highway districts; they hit upon the plan, evidenced by the Act, of providing for the needed funds, by passing an Act, double-barreled, containing two *alternative* plans, set forth in Articles 1 and 2 of the Act; the one denominated "State Unit Plan of Financing," and the other "The District Plan of Financing."

The "State Unit Plan" contemplates the issue by the Governor and the State Treasurer of "State Highway certificates of indebtedness," in the aggregate amount of $65,000,000, not more than $20,000,000 of which shall be *incurred* (issued?) in any one year.

The "District Plan of Financing" contemplates a division of the entire State into two highway districts, each of which may, under certain conditions, issue certificates of indebtedness similar to the reimbursement plan of the "Pay-As-You-Go" Act of 1924, in the aggregate amount of $35,000,000, $70,000,000 in all, $5,000,000 more than the "State Unit Plan" allows.

### THE STATE UNIT PLAN

In Article I, Section 1 of the Act, it is provided: "For the purpose of completing the construction of the State Highway System, and carrying out the provisions of this Act, the Governor and the State Treasurer are hereby authorized to issue State Highway certificates of indebtedness and notes upon the conditions prescribed in this Article," to the amount of $65,000,000, not more than $20,000,000 of which shall be issued in any one year.

The Act provides that, before the certificates shall be issued, the State Highway Commission shall transmit to the Governor a written request for their issuance, accompanied by certain information detailed; and that, if the

Governor shall be satisfied with the prospects, he and the State Treasurer shall issue the certificates. Then follows an authorization to the Governor and treasurer to borrow money and issue notes of the State under certain conditions named.

It further provides: "All certificates of indebtedness and notes issued under this Act shall be signed by the Governor and the State Treasurer. If they are issued in the name of the State, the great seal of the State shall be affixed to or impressed upon them and attested by the Secretary of State."

It further provides (Section 4): "The full faith, credit and taxing power of the State are hereby pledged for the payment of the principal and interest of the State Highway certificates of indebtedness and notes authorized by this Act."

The petitioners contend that so much of the Act as comprises Article I is violative of Sections 7 and 11 of Article 10 of the Constitution:

"§ 7. * * * No scrip, certificate or other evidence of State indebtedness shall be issued except for the redemption of stock, bonds or other evidence of indebtedness previously issued, or for such debts as are expressly authorized in this Constitution."

"§ 11. * * * To the end that the public debt of South Carolina may not hereafter be increased without the due consideration and free consent of the people of the State, the General Assembly is hereby forbidden to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or otherwise except for the ordinary and current business of the State without first submitting the question as to the creation of such new debt, guaranty, endorsement or loan of its credit to the qualified electors of this State at a general State election; and unless two-thirds of the qualified electors of this State, voting on the question, shall be in favor of increasing the debt, guaranty, endorsement, or loan of its credit, none shall be created or made. And any debt contracted by the State

shall be by loan on State bonds, of amounts not less than fifty dollars each, bearing interest, payable not more than forty years after final passage of the law authorizing such debt. A correct registry of all such bonds shall be kept by the treasurer in numerical order, so as to always exhibit the number and amount unpaid, and to whom severally made payable. And the General Assembly shall levy an annual tax sufficient to pay the annual interest on said bonds."

That the certificates of indebtedness would become, when issued, obligations, debts, of the State, we think cannot be controverted; they are directed to be signed by the Governor and the treasurer, *in the name of the State*, with the great seal of the State affixed, and "the full faith, credit and taxing power of the State" are specifically pledged to their payment. Upon its face then the authorization of their issuance flies directly in the face of the Constitution.

Counsel for the respondents however contend that this direct and primary obligation of the State cannot be considered a debt of the State, within the contemplation of Article 10, § 11 of the Constitution, for the reason that it is secured by the pledge of a fund, the gasoline tax, the motor vehicle license tax, and federal aid, which may reasonably be expected to be sufficient to meet it, without having to resort to the levy of a property tax.

In the first place, and with reference only to the State unit plan, it is not at all clear that such a pledge is created by the Act. From the provisions of Article 3, § 8 of the Act, it appears:

(1) That the amount of the income referred to, to be turned over to the highway commission, is limited, as to the gasoline tax, to 5 cents per gallon.

(2) That all of it is to be turned over to the commission to be dispensed as directed.

(3) That no part of said income, as such, is directed to be distributed by the commission, but that an amount equal to the estimate made by the commission of what shall be received during the ensuing calendar year, is appropriated to

the purposes named. In other words the whole income is turned over to the commission, mingled with its general funds, and paid out as directed.

(4) That the entire expenses of the department for the ensuing calendar year, "including all expenses of administration, operation, collection of revenues and payment of accident claims," not exceeding $450,000, are first directed to be paid out of said income.

(·5) Next is directed to be paid: "The amount necessary in order to make the payments required by this Act to be made to or on behalf of counties, highway districts and bridge districts during said calendar year or during the first fifteen days of the next succeeding year."

(6) And lastly:

"The amount necessary in order to pay the principal and interest falling due in said calendar year or during the first fifteen days of the next succeeding year on certificates of indebtedness issued under this Act"; and

"The amount necessary to make the annual sinking fund payment required by this Act to be made in said calendar year."

We assume that the income is to be distributed *pari passu* to the foregoing purposes; what may remain is to be expended upon the highways of the State.

We do not think that, under these conditions, it can be maintained that there was constituted an unimpaired source of income devoted to the payment of the certificates, not previously shared in by other objects of the Act's bounty.

But assuming the creation of a special fund from which the certificates were intended to be paid, we do not think that that at all relieves the State from its primary obligation upon them, any more than that the assignment of collateral to a note would relieve the maker from his primary obligation upon it.

A parallel is sought to be drawn between the question at issue (as to the constitutionality of the unit plan), and the decisions of this Court in the cases of *Barnwell v. Matthews,*

132 S. C., 314, 128 S. E., 712; *Briggs v. Greenville,* 137 S. C., 288, 135 S. E., 153, and *Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538. The contention is that as the Court held in those cases, *construing the "Pay-As-You-Go" Act,* that the fact that the faith, credit, and taxing powers of the counties involved were pledged did not constitute the obligations debts of the promisors, the same rule should apply to the obligations of the State; and that notwithstanding the facts that the State was undertaking for itself a gigantic enterprise, that the certificates were to be issued in the name of the State, signed by its high officials, and the great seal attached, sold by the officers of the State and the faith, credit, and taxing power of the State pledged for their payment, due to the fact that collateral was pledged as additional security, they were not debts of the State.

It is important therefore to consider these cases, the points involved, and the extent to which they may be applicable to or controlling in the present issue.

In the *Briggs case* there were two entirely separate and distinct issues presented (besides several others which are not presently of interest): (1) Whether the proposed reimbursement agreement under the "Pay-As-You-Go" Act of 1924 would constitute a *debt of the State,* incurred without a vote of the people, in violation of Article 10, Section 11 of the Constitution; and (2) whether the proposed issue of bonds of Greenville County or the coterminous highway district of Greenville County would overwhelm the levy constructed by Article 10, Section 5 of the Constitution, limiting the amount of the bonded debt of the political divisions or subdivisions of the State. These issues are not in the remotest degree related, and as a matter of course no discussion or decision of either is pertinent to a discussion or decision of the other; it would but clutter the mental operation to make the attempt.

The Court, we are still convinced, with entire propriety, decided upon the first issue mentioned above:

"Will said reimbursement agreements constitute a debt of the State incurred without a vote of the people, in violation of Section 11 of Article 10 of the Constitution of South Carolina?

"The proposed reimbursement agreements will not constitute a general liability of the State. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and federal aid. *No property tax can ever be levied to meet these obligations.*

"Is such a limited liability a debt of the State in the constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of State debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation. This purpose will not be defeated if it should be held by this Court that a debt for the construction of a state highway system, payable exclusively from federal aid moneys and special license taxes to be borne by the persons who will derive the principal benefits from the State Highway System, is not a debt of the kind required by the Constitution to be approved by the voters of the State before it is incurred. According to the weight of authority in other states, such a debt does not fall within the terms of such a constitutional provision"—citing many cases.

The conclusion appears inevitable that, if the purpose of the Constitution was a *limitation of taxation,* and under the Act "no property tax can ever be levied to meet" the obligation of reimbursement, which is itself limited to specific sources of income away and apart from taxation, there can be no objection to the constitutionality of the Act upon this ground.

In the *Florence case* the learned Circuit Judge, whose decree was adopted by the Court as its judgment, went further than it was necessary to go and further than the Court went in either the *Greenville* or the *Coastal Highway cases.* It

was there held that, under the "Pay-As-You-Go" Act, the obligation of the county upon its reimbursement notes was a contingent liability only; that the primary obligation was upon the State: " * * * The fundamental purpose of the Act (which) was to charge the State with the duty of constructing such roads, and *to impose upon it the corresponding obligation of paying for them.*" If the Court should reaffirm this doctrine, which we do not consider it necessary to do, there would be no escape from the conclusion that the reimbursement provisions under the second Article of the Act of 1929 would constitute primary obligations of the State.

The respondents can gather no comfort from the *Evans v. Beattie* case, for the same doctrine is announced as in the *Briggs case*.

"This Court has held a number of times that obligations of the same character as these bonds, secured by the pledge of a fund which might reasonably be expected to be sufficient to meet the obligations without resorting to the levy of a property tax, did not constitute bonded debt within the meaning of the constitutional limitations, notwithstanding that the full faith, credit, and taxing power of a political subdivision were pledged for the payment of the obligations. *Lillard v. Melton*, 103 S. C., 10, 87 S. E., 421; *Brownlee v. Brock*, 107 S. C., 230, 92 S. E., 477; *McIntyre v. Rogers*, 123 S. C., 334, 116 S. E., 277; *Barnwell v. Matthews*, 132 S. C., 314, 128 S. E., 712; *Sullivan v. City Council of Charleston*, 133 S. C., 189, 130 S. E., 876. In each of these cases the obligations passed upon undoubtedly constituted a debt in the technical and legal sense of that term, of a political subdivision—a debt payable in future years, evidenced by instruments designated as bonds or having all of the characteristics of bonds. In all but one of the cases the obligations were designated 'certificates of indebtedness' rather than 'bonds,' but the decisions were not placed upon the ground that a certificate of indebtedness is not a bond. Indeed, in the recent case of *Sullivan v. City Council of*

*Charleston,* 133 S. C., 156, 130 S. E., 873 (decided on the same day as the case with the same title cited above), it was held that notes which were bonds in everything but name should be deemed to be bonds within the meaning of the constitutional limitations." See, also, *Denver v. Home Savings Bank,* 236 U. S., 101, 35 S. Ct., 265, 59 L. Ed., 485.

"In one of the cases (*Lillard v. Melton*) the obligations were secured by the income of a canal company. In three of the cases (*Lillard v. Melton, Brownlee v. Brock,* and *McIntyre v. Rogers*) the obligations were secured by special assessments levied upon property benefited by street improvements, and payable in annual installments. In one case (*Sullivan v. City Council of Charleston*) the obligations were secured by past-due and unpaid taxes. In another case (*Barnwell v. Matthews*) they were secured, as in the present case, by a reimbursement agreement made pursuant to the 'Pay-As-You-Go Act.' In reliance upon the decisions in these five cases, millions of dollars of county and city obligations have been issued and are now outstanding.

"The present case cannot be distinguished upon the ground that these bonds are 'direct and general obligations' of a political subdivision, 'payable primarily' from a property tax."

The main ground upon which the *Coastal Highway case* was decided was that the Act constituted the counties affected a special highway district with practically a continuous highway from the North Carolina line to the Georgia line; that all contiguous to the proposed highway were to be benefited by it; and that the tax levied was a special assessment for local improvements, not within any constitutional inhibition. That was sufficient and all that was necessary to be decided.

The point mainly involved in the three cases referred to was a construction of Article 10, Section 5 of the Constitution, which provided a limitation upon the bonded indebtedness of counties, townships, school districts, or other political divisions or subdivisions of the State; this Section has no

application to the provisions of Section 11 of the same Article in reference to increasing the debt of the State without a submission to the people. The Court decided that, inasmuch as there was provided an independent source of income applicable to the obligations issued under the Act reasonably sufficient to meet them, these obligations should not be added to the existing debts of the obligors in determining whether the limitation of Section 5 had been exceeded. *It was not at all decided that the obligations were not debts of the obligors;* in fact the proceedings were instituted to test their validity, and it was sustained. The conclusion was assimilated to the principle frequently announced that the amount of a sinking fund, on hand, applicable later to the retirement of municipal bonds, may be deducted from the existing debt.

The cases are of no weight in determining the question now at issue, whether the proposed certificates of indebtedness *of the State* will constitute obligations forbidden by Section 11 without submission to an election. The situations are as dissimilar as could be conceived. There is no constitutional requirement that political divisions of the State, before issuing bonds, must submit the question to an election; *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421; they are affected only by Section 5 of Article 10, fixing a limit thereto. There *is* a constitutional requirement that the State shall not increase its debt without a submission to an election; there is no limitation or latitude whatever to the incurring of such debts, no zone of safety provided.

It is helpful at times, by showing what *may be done,* to determine what *may not be done;* it may be conceded that if the Act under review, under the unit plan, proposed to fix no liability upon the State, an undertaking by the State to devote certain sources of income to the payment of obligations assumed by a political division would not constitute a debt of the State, subject to the provisions of Section 11. The following cases are illustrative of this principle, and the implication is clear, that if, in addition to this collateral

security, the State proposed "to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or otherwise," it would not be entitled to rely upon the principle stated to repudiate the duty imposed by Section 11.

In *State v. Clausen*, 134 Wash., 196, 235 P., 364, 366, an Act authorizing a bond issue for the erection of a state capitol building, the principal and interest from the bonds to be payable only from revenues from the leasing and sale of lands granted to the State for such purposes by the federal government, it was held not to create a debt without a vote of the people, in violation of the Constitution of the State of Washington.

In this case, however, the Court also had the following to say: *"In no possible way is the credit of the State involved. Not one dollar of its general property can be used to discharge those bonds or the interest on them. Not one dollar of taxes can be put to that purpose."*

In *Kasch v. Miller*, 104 Ohio St., 281, 135 N. E., 813, 814, bonds issued in the name of the State of Ohio, and payable exclusively out of the revenues derived from reservoirs, dams, etc., for which the bonds were issued, or out of the sale of the corpus in case of default, were held to be not a debt of the State within the meaning of the constitutional limitations.

In this case the Court says:

"As ordinarily understood, a debt is a sum which may be owing from one to another, and connotes an obligation upon the part of the debtor to pay. If the legislative Act saddles an obligation upon the State to pay a sum of money either *in preasenti* or *in futuro,* since such obligation does not come within the limitation provided for in Sections 1 and 2, Article 8, referred to, undoubtedly the Legislature would be exceeding its power in the passage of the Act. An inspection of the Act, however, discloses that under no circumstances, and under no possibility, can the State be made to answer

for any of the obligations created by the Act, by reason of the construction of such improvement." * * *

"The Act itself explicitly provides in Sections 41–2, General Code, that said bonds 'shall create no liability upon, nor in any wise be considered an indebtedness of the State of Ohio.'" * * *

"Were this the creation of a state debt, or a pledging of its financial credit, directly or indirectly, this Court would not hesitate to pronounce the legislative Act void. But we fail to perceive, even by a strained construction, how the Act under consideration, or its mode of operation, violates the provisions of the Constitution. The debt created under the Act is not a state debt; the bonds authorized thereunder entail no obligation upon the State which it is required, either legally or morally, to assume; the mortgage attaches to no property owned by or purchased with the revenues of the State."

In *Wright v. Hardwick*, 152 Ga., 302, 109 S. E., 903, 906, it was held that obligations of the State of Georgia, payable exclusively out of the rentals of a state-owned railroad, did not constitute debts incurred in violation of constitutional provisions prohibiting the creation of state debt, the majority opinion stating: "The warrants in pursuance of the Act are drawn against a certain specified fund which it is anticipated will be in the treasury to meet them at the time fixed therein for their payment, and they are to be paid exclusively out of that fund; and should it fail to materialize —that is, not be in the treasury to meet the warrants at their maturity—then the holders of the purchased and discounted warrants would have no recourse against the State on the warrants themselves."

*In re Canal Certificates,* 19 Colo., 63, 34 P., 274, 275, certificates of indebtedness issued by the State of Colorado were held to be exempt from the constitutional limitations upon the amount of state indebtedness, the Court saying: "The expenses of construction of the canal in question are to be met in part by certificates of indebtedness. Both prin-

cipal and interest of these certificates are only to be paid out of funds received for the carriage of water or in payment for lands. The Act expressly provides against any indebtedness being incurred on the part of the State, and therefore is not in conflict with the constitutional provisions heretofore considered by this Court, fixing a limitation upon State indebtedness." See *In re Appropriations,* 13 Colo., 316, 22 P., 464.

In *Brown v. Ringdahl,* 109 Minn., 6, 122 N. W., 469, 470, certificates of indebtedness, issued in the name of the State of Minnesota, and made payable exclusively from a special tax, were held to be not state debts within the meaning of the constitutional limitations. In this case the Court said:

"The certificates in and of themselves create no indebtedness against the State. On the contrary they are mere evidence of the holder's right to demand and receive 'from the State Treasurer the proceeds of the tax authorized by the Act to be levied and collected, and known and classified as the "Prison Building Fund."' Fairly construed, the Act contemplates their payment from this fund exclusively, and they are not general obligations of the State. * * *

"If the certificates could be construed as creating an indebtedness against the State payable from the general revenue fund, a different question would be presented. But they are not. They are to be issued in anticipation of funds provided for and appropriated, rightfully under the *Lamberton case,* and are valid only as respects that fund when paid into the State treasury."

The *Minnesota case* is an interesting one as regards both the main and the dissenting opinions. The certificates of indebtedness were sustained upon the ground, as indicated in the foregoing excerpt, that they, in themselves, created no indebtedness against the State, but were merely evidence of the holder's right to have them paid out of the tax levy provided. The dissenting opinion holds strongly that the certificates were obligations of the State. In the case at bar

the certificates are not only to be issued in the name of the State, but the faith, credit, and taxing power of the State are behind them. Evidently the express obligation of the State was provided for in order to insure the profitable disposition of the bonds, the marketability of which would be seriously impaired if they had nothing behind them but the outside income.

In *Shields v. City of Loveland,* 74 Colo., 27, 218 P., 913, 916, the Court said: "The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay."

In *Winston v. City of Spokane,* 12 Wash., 524, 41 P., 888, where the loan was to be paid out of a special fund created by the receipts derived from such waterworks, the opinion was predicated upon the principle that it was to be so paid "without imposing any further liability on the general funds of the city."

All of the authorities cited in support of this doctrine appear clearly to hinge on the proposition that in no possible way is the property of the State, which is subject to general taxation, or to special taxation for other purposes, to be liable for $1 of taxes for the payment of obligations incurred without the constitutional limitations in creating a special fund for a specific purpose. For if such liability does exist, however contingent, then the constitutional limitation is invoked and applied "as a protection to taxpayers, and especially those whose property might be subjected to taxation." *Briggs v. Greenville County (supra).*

Counsel for respondent says:

"The character of special funds for improvements is not changed by pledging the full faith, credit and taxing power of the State to the payment of the obligations issued in anticipation of the collection of special taxes, pledged to the payment thereof.

"Nor does such pledge transform such special funds for improvements into a public debt, because such pledge merely

assures that upon failure or inadequacy of the special taxes pledged another special tax authorized, namely the *ad valorem* tax upon property authorized in that contingency, will be used."

The very next paragraph reads: "This pledge of faith, credit and taxing power of the State is merely a pledge of honor, because the State cannot be sued for an enforcement thereof without its consent."

The last paragraph quoted contains a strange and dangerous doctrine which cannot be reconciled with the preceding paragraphs. Any one must know that the certificates and notes cannot be marketed and liquidated at anything like par, if at all, unless the "full faith, credit and taxing power of the State" are pledged to their redemption. No one would deny that that is why the pledge was written in the Act. It means that the pledge has a definite value of which the framers of the Act and the General Assembly were fully aware, otherwise they would not have jeopardized the whole Act by its insertion. That value is the liability of taxpayers whose property might be subjected to taxation "upon failure or inadequacy of the special taxes pledged," and it is inconceivable that the State could capitalize this asset and escape the obligations which its pledge necessarily brings, even though it is "merely a pledge of honor" upon which the State cannot be sued without its consent.

In *Fowler v. City of Superior*, 85 Wis., 411, 54 N. W., 800, 802, it was held that, where improvement bonds of a city declared that it "acknowledges itself indebted to and promises to pay the bearer hereof the sum of ——— dollars, lawful money of the United States," and that they were payable out of the proceeds of the improvement assessments chargeable on the property benefited, and that they were issud on the faith and security of such assessments, that the city was bound absolutely for the payment of the bonds, though it might be reimbursed from the payment of the improvement assessments, and that they constituted municipal indebtedness, within the meaning of Const. Art. 11, §

3, prohibiting a municipality from incurring an indebtedness exceeding 5 per cent. of the value of the taxable property therein.

In *Feil v. City*, 23 Idaho, 32, 129 P., 643, 43 L. R. A. (N. S.), 1095, it was held that where a city, already indebted to the limit prescribed by the Constitution, passed an ordinance for the issuance of water bonds, and agreed to maintain rates to pay the expenses of the works, interest on the bonds, and the principal in 20 years, such bonds constituted a liability of the city and were invalid under the Constitution.

In *Castle v. City*, 187 Ky., 397, 219 S. W., 439, it was held that the fact that local improvement bonds which create an indebtedness in excess of constitutional limitation are to be paid out of special assessments does not render them legal on the theory that they do not create an indebtedness against the city, where the credit of the city is pledged for the payment of the principal and interest thereon; but if city's obligation is confined merely to collecting the assessments, its liability is not an indebtedness within the constitutional provision prescribing a debt limit.

In *Butler v. City*, 113 Or., 174, 232 P., 655, it was held that where a contract creating indebtedness provides for a special fund with which to meet indebtedness as it accrues, and no general liability is created against the municipality, such an indebtedness is not within a constitutional inhibition against debt in excess of a fixed amount.

In *Jackson v. School District*, 280 Pa., 601, 125 A., 310, it was held that a municipality may create debt within its current revenues regardless of its existing indebtedness, but cannot go beyond, even where payment is to be made solely out of a specially designated income.

The point is simply this : Where there is created no obligation on the part of the State, and the proposed improvements are to be paid for out of a designated special source of income, the State is but a trustee of an express trust, to apply such income to the stated purpose, incurring no liability itself other than what might spring from a discharge of

that trust; but where, in addition to its trust relation, the State has expressly assumed the payment of the obligations, the existence of the trust relation will not relieve the express obligations from the character of debts.

A very serious objection is made to the entire Act, which concerns both plans, that it is an alternative law, dependent upon the will and option of a department of the executive branch of the government—in effect, a delegation of legislative prerogatives and duties.

After providing for the issue of certificates of indebtedness *by the State,* in Article 1 of the Act (1929), the Act (Art. 2, § 1) provides that: "Instead of requesting the Governor to issue State Highway certificates of indebtedness or notes as provided in Article 1 of this Act, the State Highway Commission may, at its option, enter into one or more reimbursement agreements with one or both of the highway districts created by this Article, and certificates of indebtedness and notes of these highway districts may be issued, as provided in this Article."

We do not think that such legislation is permissible.

The whole legislative power of this State, its whole capacity to make laws and to provide the means for their enforcement, is vested by the Constitution in *the two branches,* Senate and House of Representatives, *together* constituting the General Assembly of South Carolina *when met and in session as such.* Constitution of 1895, Article 3, § 1; *Massey v. Glenn,* 106 S. C., 71, 90 S. E., 321, 322; *State v. Hayne,* 4 S. C., 420.

In the *Massey case,* our Court, quoting from the *Hayne case* in regard to a similar Article in the Constitution of 1868, says: " 'Although the particular office of this Section is to fix certain important features of the body through which the function of legislation is to be exercised, yet it describes in an authoritative way the nature of the power thus vested. It is no less than the legislative power of the State. It is not such and so much of the legislative power of the State as were intended to be used by that particular body,

but it was the *whole legislative power of this State*, its *whole capacity of making laws,* and providing the means for their enforcement. It was not intended that the Legislature should exercise this power without limitation and restraint, for the Constitution that uses these words of grant imposes many such restrictions and limitations affecting the extent to which it may be effectively exercised.' " And the laws are to be enacted in the manner laid down in this Article of the Constitution, especially Section 18.

Mr. Cushing, in Law and Practice of the Legislative Assembly, p. 201, par. 496, says that the authority and power of members of the Legislature as such was confined to the *term of sitting of the body as a whole.*

It is equally clear in this State, as well as in all forms of American government, and is a primary principle that legislative, executive, and judicial powers must be kept separate and distinct. Constitution of 1895, Art. 1, § 14.

We have not found a case in this State dealing specifically with encroachment by the legislative on the executive department. The general principle has arisen in reference to encroachment on the judicial more often, and our Court has spoken emphatically in regard thereto in *Segars v. Parrott,* 54 S. C., 27, 31 S. E., 677, 865; *Lyon v. Patterson,* 102 S. C., 525, 87 S. E., 306.

And Mr. Tiffany in his work, Government and Constitutional Law, American Theory, p. 63, § 117, says: "The sphere of legislation is distinct both from the sphere of adjudication and execution. Congress can enact any constitutional law and make it binding upon the people individually. But it has no authority to interpret, construe or apply the law enacted."

Mr. Stimson in his book, Federal and State Constitutions of the United States, published in 1908, pp. 195–6 says: "Sec. 200. *The Three Functions.*—By the Constitutions of nearly all, the powers of Government are divided into three distinct departments—legislative, executive, and judicial, 'to the end that it be a government of laws, not of

men.' And in most of these it is declared that no person or collection of persons exercising the functions of one department shall assume or discharge the functions of any other. They (the three departments) *ought to be* kept as *separate* from and *independent* of each other *as the nature of a free government will admit."*

In the other states the same thing is implied by the distribution of all such power in separate articles, as in the United States Constitution: " 'One of the settled maxims in constitutional law is, that the power conferred upon the Legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made, until the Constitution itself is changed. The power to whose judgment, wisdom and patriotism this high prerogative has been intrusted, cannot relieve itself of the responsibility, by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust.' " *Vesta Mills v. City Council,* 60 S. C., 7–8, 38 S. E., 226; 1 Cooley's Const. Lim. (8th Ed.), pp. 224–6, 240; *Port Royal M. Co. v. Hagood,* 30 S. C., 525, 9 S. E., 686, 3 L. R. A., 841. The quotation above is made by this Court in the *Vesta Mills case* from Cooley's Const. Limitations.

Mr. Cooley, in the 8th Edition, further says, at page 240:

"On this question of expediency the Legislature must exercise its own judgment definitely and finally. * * * They appeal to no other man or men to judge for them in relation to its present or future expediency."

"One of the most important tests as to whether particular laws amount to an invalid delegation of legislative power is found in the completeness of the statute as it appears when it leaves the hands of the Legislature. The generally recognized principal is that a law must be so complete in all its terms and provisions when it leaves the legislative branch of the

government that nothing is left to the judgment of the electors, or other appointee or delegate of the Legislature." 6 R. C. L., p. 165, § 166, and cases cited in note; *State ex rel. v. Butler,* 105 Me., 91, 73 A., 560, 562, 24 L. R. A. (N. S.), 745; *Arms v. Ayer,* 192 Ill., 601, 61 N. E., 851, 58 L. R. A., 277, 85 Am. St. Rep., 358; *Schaezlin v. Cabaniss,* 135 Cal., 466, 67 P., 755, 56 L. R. A., 736, 87 Am. St. Rep., 122; *Louisville H. & St. L. R. Co. v. Lyons,* 155 Ky., 396, 159 S. W., 971, 48 L. R. A. (N. S.), 672; 6 R. C. L., p. 179, § 179, p. 175, § 175.

The Supreme Court of Maine, in *State ex rel. v. Butler* above, uses this language: "The people of Maine in organizing their government as a state vested the legislative power of the government in a body 'to be styled the Legislature of Maine' (Const. Art. 4, p. 1, § 1), and did not confer any such power on any other person or body, and did not authorize the Legislature to do so. It follows that the Legislature alone can exercise the legislative power, and alone is responsible for its wise exercise, and hence cannot transfer any of the power nor any of the responsibility to any other department or person."

Then follows a quotation from Cooley's Const. Limitations: "Though legislative power cannot be delegated to Boards and Commissioners, the Legislature may delegate to them administrative functions in carrying out the various purposes of a statute and various governmental powers for the more efficient administration of the laws. 'The suspension of a statute is a legislative Act (here the suspension of Art. I of the Act) unless based upon some condition, contingency, exigency, or state of facts declared by the legislative enactment to be sufficient to warrant the suspension by an executive or administrative body whose duty it is to execute or administer the law suspended.' " 1 Cooley's Const. Lim. (8th Ed.), pp. 230, 237, and Notes and Cases; 6 R. C. L., p. 179, § 179; p. 178, § 178.

The author of R. C. L., in Section 178, thus states the rule: "A legislature in enacting a law complete in itself, de-

signed to accomplish the regulation of particular matters falling within its jurisdiction, may expressly authorize an administrative commission within definite valid limits to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose."

The distinction seems to be that, while the legislature cannot delegate power to make a law, it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its action dependent. *Winslow v. Fleischner,* 112 Or., 23, 228 P., 101, 34 A. L. R., 829–832, and cases; *U. S. v. Grimaud,* 220 U. S., 520, 521, 31 S. Ct., 480, 55 L. Ed., 569; *Field v. Clark,* 143 U. S., 649–700, 12 S. Ct., 495, 36 L. Ed., 310; *Union Bridge Co. v. U. S.,* 204 U. S., 381–383, 27 S. Ct., 367, 51 L. Ed., 531, 532; *State v. Great Northern Ry. Co.,* 100 Minn., 445, 111 N. W., 289, 10 L. R. A. (N. S.), 253; *State ex rel. v. Levitan,* 190 Wis., 646, 210 N. W., 111, 117, 48 L. R. A., 445; *Dowling v. Lancashire Ins. Co.,* 92 Wis. 63, 65 N. W., 738, 31 L. R. A., 114, 115; *Hewitt v. Board of Examiners,* 148 Cal., 590, 84 P., 39, 3 L. R. A. (N. S.), 896, 113 Am. St. Rep., 315; *Arms v. Ayer,* 192 Ill., 601, 61 N. E., 851, 854, 85 Am. St. Rep., 358, 359; *Hurwitz v. U. S.,* 280 F., 111 (8th C. C. A. Mo., 1922).

*Winslow v. Fleischner,* 112 Or., 23, 228 P., 101, 34 A. L. R., 829. This was an order of a commission closing the right to hunt game for a year, and the Court held that it was legislation which could not be delegated by the Legislature. In the opinion is the following quotation from 1 Lewis' Sutherland, Statutory Construction (2d Ed.), pp. 148–170, §§ 89–101:

"Legislative power is delegated contrary to the maxim stated when the Legislature attempts to confer on others a power of substantive legislation, to be exercised independently or in connection with the Legislature, or when it constitutes an inferior Legislature or law-making body. At the same time it is necessary for the Legislature to confer more

or less of discretion upon executive and administrative officers in applying a law and carrying it into effect, and in many cases it is expedient to vest in such officers more or less of power to make rules and regulations for the purpose of applying and executing the law. It is, perhaps, impossible to lay down any general rule by which it may be certainly and readily determined whether such a law is or is not an unlawful delegation of legislative power. 1 Lewis' Sutherland Stat. Const. (2d Ed.), 149.

"The true test and distinction whether a power is strictly legislative, or whether it is administrative, and merely relates to the execution of the statute law, 'is between the delegations of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law.' The first cannot be done. To the latter, no valid objection can be made."

It cites and quotes from the United States Supreme Court cases mentioned above. *Field v. Clark,* 143 U. S., 692–694, 12 S. Ct., 495, 504, 36 L. Ed., 310.

This case raised the question of the right of the President to suspend duties or tariffs on certain articles upon his finding that the regulations of other countries were reciprocally equal and reasonable, or the contrary. The question arose as to whether this was delegating a legislative power. Among other things, the Court says (opinion by Mr. Justice Harlan) :

"That Congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution.   *   *   *   Congress itself prescribed, in advance, the duties to be levied, collected, and paid on sugar, molasses, coffee, tea, or hides, produced by or exported from such designated country while the suspension lasted. Nothing involving the expediency or the just operation of such legislation was left to the determination of the

president. The words 'he may deem,' in the third section, of course implied that the president would examine the commercial regulations of other countries producing and exporting sugar, molasses, coffee, tea, and hides, and form a judgment as to whether they were reciprocally equal and reasonable, or the contrary, in their effect upon American products. But when he ascertained the fact that duties and exactions reciprocally unequal and unreasonable were imposed upon the agricultural or other products of the United States by a country producing and exporting sugar, molasses, coffee, tea, or hides, it became his duty to issue a proclamation declaring the suspension, as to that country, which Congress had determined should occur. He had no discretion in the premises except in respect to the duration of the suspension so ordered. But that related only to the enforcement of the policy established by Congress. As the suspension was absolutely required when the president ascertained the existence of a particular fact, it cannot be said that in ascertaining that fact, and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws. Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency. What the president was required to do was simply in execution of the Act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect. It was a part of the law itself, as it left the hands of Congress, that the provisions, full and complete in themselves, permitting the free introduction of sugar, molasses, coffee, tea, and hides, from particular countries, should be suspended in a given contingency, and that in case of such suspension certain duties should be imposed.

" 'The true distinction,' as Judge Ranney, speaking for the Supreme Court of Ohio, has well said, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring au-

thority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter, no valid objection can be made.' * * * The proper distinction, the Court said, was this: 'The Legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation.' "

This decision is recited and reaffirmed frequently by other Courts:

*Union Bridge Co. v. U. S., supra.* This was a case raising the question of the authority of the Secretary of War to prevent an unreasonable obstruction by a bridge over a navigable water, Allegheny River, near its junction with Monongahela, and the decision rests largely on the same principles as *Field v: Clark,* and it quotes extensively from it.

*U. S. v. Grimaud,* 220 U. S., 520, 521, 31 S. Ct., 480, 55 L. Ed., 563, *supra.* This was a question as to the authority to punish persons who grazed sheep on public lands contrary to regulations issued by the Secretary of the Interior, and that the license prescribed was necessary to be obtained from him. The decision rests largely upon the *Field v. Clark case,* and that line of cases, and cites and quotes from the *Field case.*

In *State ex. rel. v. Levitan,* the Supreme Court of Wisconsin thus lays down the true rule and distinction:

"And so, in the case at bar, when we bear firmly in mind the object and purpose of the Act we are forced to the conclusion that no legislative power was delegated to the department, but merely administrative power, and that such administrative power consisted in the finding of certain facts

which the Legislature has seen fit to prescribe as necessary to the issuance of a license; and, such facts having been found, the license must issue under the Act as a matter of course. * * *

"The Legislature has thus in express language fixed the terms of the bond, leaving the department to determine in each particular case what amount shall be required as sufficient, and what sureties shall be approved in order to effectuate the carrying out of the purpose of the Act, which is the protection of the public from unfair and fraudulent dealing. Whether the bond is sufficient under any particular case depends upon facts, and it is clear that the Legislature intended that the department shall ascertain the facts, and when such facts shall be found, the bond shall be approved."

In *Little Chute v. Van Camp,* 136 Wis., 526, 117 N. W., 1012, 128 Am. St. Rep., 1100, the Court says: "A legislative body *cannot delegate to a mere administrative officer power to make* a law, but it can make a law with provisions that it shall go into effect or be suspended in its operation upon the *ascertainment of a fact or state of facts by an administrative officer or board. Dowling v. Insurance Co.,* 92 Wis., 63, 65 N. W., 738, 31 L. R. A., 112; *M., St. P. & S. S. M. R. Co. v. R. R. Commission* (Wis.), 116 N. W., 905. In the present case the ordinance by its terms gives power to the president to *decide arbitrarily,* and in the exercise of *his own discretion* when a saloon shall close. This is an attempt to vest *legislative discretion in him,* and cannot be sustained.

In the case of *Arms v. Ayer,* the Supreme Court of Illinois says: "The general rule is that a statute must be complete when it leaves the Legislature—as to what the law is—leaving its execution to be vested in third parties. Thus it was said in *Dowling v. Insurance Co.,* 92 Wis., 63, 65 N. W., 738, 31 L. R. A., 112: 'The result of all the cases on this subject is that a law must be complete in all its terms and provisions when it leaves the legislative branch of the government, and nothing must be left to the judgment of the

electors, or other appointee or delegate of the Legislature, so that in form and substance it is a law in all its details *in praesenti,* but which may be left to take effect *in futuro,* if necessary, upon the ascertainment of any prescribed fact or event.' " Then follows a quotation already made from Sutherland on Statutory Construction.

The principle is recognized by our Court in *Lillard v. Melton,* 103 S. C., 18, 21, 87 S. E., 421, 425, 426, where Circuit Judge Smith, speaking for the Court, says: "It is clear that the Legislature did not attempt a delegation of power, as the most casual observation of the enactment will disclose. *It makes a direct imposition, which is a fully* authorized exercise of legislative power." And again at page 21: "The language of Section 1 of the Act is mandatory as to the issuance of the bonds by the commission therein created for permanent highway improvement. The only discretion vested in the commission is as to the denomination, times, and amounts of the issue, not to execeed a maximum amount."

"Our decision in *Seattle v. Gibson,* and those of the Federal and State Courts upon which that decision is rested rendered it plain that it is sufficient to render a law or ordinance void in the light of these constitutional guaranties, if the prescribed manner of administering such law or ordinance results in leaving the question of the propriety of issuing, withholding, or revoking a license to conduct an ordinary lawful business, and thus the question of who may and who may not engage in such business, to the *decision of any officer or set of officers, uncontrolled by any prescribed rule of action." State ex rel. Makris v. Superior Court,* 113 Wash., 296, 193 P., 845, 847, 12 A. L. R., 1432. See exhaustive note to same case, pages 1437, 1438, 1443, 1444; *P. De Ronde & Co. v. U. S. Sugar Equal. Board* (D. C.), 299 F., 659, 662.

In the *Makris case,* the Court further says at page 1434: "We are not deciding that a business of the nature here in question may not be regulated within reasonable limits

through the passage and enforcement of ordinances by the city; but only that the city has not the power, neither can the Legislature confer upon it the power, to enact a valid ordinance by the terms of which some officer or set of officers controlled by no more specifically prescribed rule of action than is found in the revocation provisions of this ordinance may decide who may or may not conduct the manifestly ordinarily lawful business of a soft drink and candy store."

In the note at page 1436, the author says: "The generally accepted rule is to the effect that a statute or ordinance which vests arbitrary discretion with respect to an ordinarily lawful business, profession, appliances, etc., in public officials, without prescribing a uniform rule of action, or, in other words, which authorizes the issuing or withholding of licenses, permits, approvals, etc., according as the designated officials arbitrarily choose, without reference to all of the class to which the statute or ordinance under consideration was intended to apply, and without being controlled or guided by any definite rule or specified conditions to which all similarly situated might knowingly conform—is unconstitutional and void."

And District Judge Morris, of Delaware, in the *De Ronde case* above, says:

"From this premise it would seem inevitably to follow, not only that the recognition of moral claims against the government is solely a congressional power, but also that in the exercise of that power Congress alone can determine what claims shall be recognized and paid. This it may do by providing for the payment of specific claims absolutely, or by providing for the payment of claims having specified attributes or coming within a defined class. The Congress may decide for itself all the facts with respect to the claims, or it may prescribe the principal or major premise by which all claims to be paid must be tested, and leave to a specified tribunal or officer the determination of what claims fall within that rule. *Guthrie National Bank v. Guthrie,* 173

U. S., 528, 537, 19 Sup. Ct., 513, 43 L. Ed., 796; *United States v. Realty Co.,* 163 U. S., 427, 441, 443, 16 Sup. Ct., 1120, 41 L. Ed., 215; *Town of Guilford v. Supervisors, etc.,* 13 N. Y., 143.

"But if the Congress goes further, and confers upon an officer or tribunal, not only the power to determine some specified fact or state of things, the minor premise with respect to the particular claims, but also the power to make its own controlling rule, principal, or major premise with respect to their payment or nonpayment, it confers or attempts to confer upon such officer or tribunal a complete and absolute discretion. Such an Act, however, would be a delegation of the full legislative power and discretion with respect to the payment of such claims, and hence invalid. *Field v. Clark,* 143 U. S., 649, 692, 694, 12 Sup. Ct., 495, 36 L. Ed., 294."

It seems clear, therefore, that the Act in question has not committed to the Highway Commission the determination of a matter of *fact* upon the existence of which the law should take effect, but has committed to its uncontrolled discretion the determination of which of the two completed plans should be put into operation.

Another reason why this alternative legislation cannot be approved is thus expressed by the Nebraska Court in the case of *Searle v. Yensen,* 226 N. W., 464, 466: "The power of the Legislature to delegate a part of its legislative functions to municipal corporations or other governmental subdivisions, boards, commissions, and tribunals, to be exercised within their respective jurisdictions, cannot be denied; *but the recipient of such powers must be members of the same governmental department as that of the grantor.* Otherwise a confusion and duplication of powers would result, against which the section of the Constitution above quoted is directed. The Legislature may not impose upon the judiciary or the executive the performance of acts or duties not properly belonging to those departments respectively. *People v.*

*Nussbaum,* 55 App. Div., 245, 67 N. Y. S., 492. The above considerations are not to be deemed as prohibiting the Legislature from imposing upon the other departments the performance of new and additional duties, *but the duties so imposed upon either must be of the character and quality which such departments, respectively, are authorized or may be required to perform."*

Unquestionably the Highway Commission is a factor of the executive department of the government; it has no legislative powers; they are purely administrative; and yet to them the Act proposes to commit not only the determination of what construction should be placed upon a statute, *but what that statute shall be.*

### The District Plan of Financing

This plan is subject of course to the objection that the Act as a whole proposes an alternative method of legislation. If that objection be valid, the whole Act passes out. We shall discuss it therefore as if the plan of two districts stood alone in the Act.

It is proposed to sustain this plan under the *Evans v. Beattie case,* the *Coastal Highway case.* We do not think that it is possible to do so. The bonds in that case were sustained upon two grounds: (1) That there having been provided an independent source of income to meet the bonds issued under the Act of 1924, they could not be considered in determining the issue whether they would increase the bonded debt of the several counties beyond the 8 per cent. limitation in Section 5, Article 10 of the Constitution; (2) the Coastal Highway Act was explicitly sustained as the exercise of the right of the Legislature, "to carve out of the territory of the State a special district, and to order in the form of a tax upon all the property in that district a special assessment for *local* improvements."

The first ground has already been considered as affording no support for the two-district plan.

As to the second ground:

Under the Act construed in that case it was proposed to connect up certain highways in the counties composing the highway district, making a continuous highway extending from the North Carolina to the Georgia line, a link in a national highway from Canada to southern Florida, in which all of the people in all of the counties designated are interested and will be benefited. It was not proposed to create a highway district of these counties and authorize bonds to be issued to construct all improved highways in all of the counties. We doubt very much if that could have been done.

It was recited in the Act (Act March 12, 1926 [34 St. at Large, p. 1495], § 5) : "Inasmuch as the highways above described, together with certain other section of highway situated in the Counties of Marion, Berkeley, Charleston and Hampton, constitute a, continuous highway, commonly known as the Coastal Highway, running across the State of South Carolina from North Carolina to Georgia, through all of the counties in the highway district hereby established, with a branch highway running from said highway to the Town of Beaufort, it is hereby determined that the construction of the highways above described will be of special benefit to all property owners in the said highway district."

Acting upon the legislative declaration that the local improvement would "be of special benefit to all property owners in the said districts," stress was laid upon, and authorities cited to sustain the power of the Legislature to levy taxes upon a special district for *local* improvements; the Court declaring: "We think it is clear therefore that the Coastal Highway Act is the exercise of the power of the General Assembly to impose a special assessment for local improvements and not a general tax for public purposes, and that this power is derived from the general legislative powers of the General Assembly, not restricted by any constitutional provisions or by the absence of special constitutional au-

thority. The question, then is whether the Act is a proper exercise by the General Assembly of the power vested in it."

In the present Act there is no semblance of a provision for local improvements. It may as well have converted the entire state into one highway district as to divide it into two; the two comprise the entire State; or, instead of dividing the state into two approximately equal districts, to make a district out of one county and another district out of all of the remaining counties. The income of each of the districts is to be expended upon all of the highways in all of the counties, regardless of the vast sums of money already expended by many of the counties upon its own highways.

In the *Coastal Highway case,* the special assessment applicable to the territory through which the proposed highway passed was necessarily, because of its proximity to the highway, calculated to have reflected upon it, *commensurate advantages and benefits, which would offset the special assessment imposed for the construction of the highway;* but here, many of the counties in the proposed two districts have had their state highways completed under the county reimbursement plan under the "Pay-As-You-Go" Act, and to subject the citizens and taxpayers of these counties to the extra assessment would certainly affect those who could not possibly receive a corresponding benefit from the tax.

Evidently what was in contemplation in the *Coastal Highway case* was such an undertaking as directly and proximately reflects itself in commensurable advantages to contiguous property. Here, we have counties in the State without completed state highways, or without completed concrete roads, and it is estimated that under the "Pay-As-You-Go" Act it will take a little more time to complete them. To obviate this extra time, it is said, that an immediate and available fund of $65,000,000 is necessary. To obtain this, a statewide plan is proposed which obviously runs counter to every fundamental principle of constitutional right and prerogative; then, a so-called "Two-District Plan" is ingeniously

contrived, splitting the State, as a whole, into two highway districts. The effort is clearly to come within the sheltering wings of the *Coastal Highway* and other district cases, decided by this Court. But to justify such action on the part of the legislative body (1) there must be an inherent and special benefit inuring to those who bear the burden of the special assessments; (2) there must be a rational plan of equalization and apportionment of the burden. If no benefit inures to those through whose property the highways pass of a special character commensurate with the tax, or, if the plan is manifestly unfair and unjust as it is here, it necessarily invades the taxpayer's constitutional right of "due process of law" to deprive him of his property.

In the case of *Truax v. Corrigan,* 257 U. S., 312, 42 S. Ct. R., 124, 66 L. Ed., 254, 27 A. L. R., 375, the Court said, in effect: That while no one has a vested right in a rule of the common law, yet the legislative power of a state can only be exercised in subordination to the fundamental principles of right and justice, which the guaranty of due process of law, in the United States Constitution, Fourteenth Amendment, is intended to preserve, and a purely arbitrary or capricious exercise of that power, whereby a wrongful and highly injurious invasion of property rights is practically sanctioned and the owner stripped of all real remedy, is wholly at variance with these principles.

Another consideration rendering it impossible, in the exercise of good faith to the people of the State, to sustain the plan of two districts, is this: So long as the reimbursement agreement involves no more than the appropriation of that part of the proceeds from the gasoline tax and automobile licenses, which by statute is allotted to the county (or district), the agreement is within the terms of the decisions of this Court. But if the statute authorizing a reimbursement agreement should extend beyond this point, if it should seek to create without a vote of the people a public debt having all the essential characteristics of a state debt, its constitu-

tionality will not be saved by the device of having the evidence of such public debt issued in the name of two districts into which the State for this very purpose is divided.

The fact that the certificates or bonds are to be issued in the name of the two districts does not determine the real nature of the indebtedness. *These certificates or bonds are merely evidences of the debt.* The character of the debt—as to whether it is a public debt of the State—is to be determined by its real nature. If it is a public debt resting upon the people of the entire state and payable by taxes levied uniformly throughout the entire area of the State, then it is in fact a State debt.

*The terms of the statute show that the debt which it seeks to create, whether evidenced by state or district bonds, is a state debt.*

The terms of the Highway Act of 1929 demonstrate that the real purpose of the Act was the creation of a public debt, applying to the entire state and payable out of the resources of the State. This is the character of the debt whether evidenced by state or district bonds.

In the title it is declared that the purpose is to provide for the construction of the State Highway System and for the payment of the outstanding bonds issued by the State Highway Commission and by the counties and the districts, *and to authorize the issue of evidences of indebtedness by the State, or to divide the State into two districts and to authorize the issue of certificates of indebtedness of these districts.* Note that it is the *same public debt to be paid in the same way, whether the evidences thereof be issued by the State or by the two districts.*

The preamble of the Act declares that the method of issuing bonds by the counties and highway districts, backed by reimbursement agreements, is inadequate, and that the only practical way is to construct the State Highway System "with borrowed money" and *to enable the State to make "an immediate investment" in a "complete state highway system."*

In other words, the method, which has been declared by this Court to be constitutional, is abandoned as "inadequate," and the State is to make an "immediate investment" in a complete state highway system with borrowed money. The *State* is to do this.

The body of the Act outlines two plans of financing this borrowing of money, one denominated "State Unit Plan of Financing," and the other "The District Unit Plan of Financing." Under the first plan, bonds or certificates of indebtedness of the State are to be issued and sold. The employment of the second plan is at the option of the highway commission; and, to this end, the Act divides the territory of the State into two highway districts, and authorizes the districts to enter into an agreement with the State Highway Commission by which the district agrees to advance the money for completing the highways within the district, the State Highway Commission agreeing to reimburse the district for the moneys so advanced out of the gasoline and motor vehicle license taxes; bonds or certificates of indebtedness are to be issued and these are to be paid out of these special taxes. The reimbursement is *not* limited to that part of the special taxes which would have been apportioned under the law to the roads within the district. *There is no such feature in this reimbursement agreement.* But the agreement binds the commission to the repayment of the moneys loaned and in the installments of principal and interest stipulated in the obligations of the district. In other words, the plan for financing this state-wide project—this immediate investment, "on the part of the State"—is that the two districts, into which the State has been divided, for this special purpose, shall advance to the commission moneys which shall be employed in the construction of the "complete State highway system," which debt the commission agrees to repay.

In other words, the debt created for this "borrowed money" is assumed by the State Highway Commission (a state agency), under an agreement to pay such debt out of

the revenues derived from a state-wide tax upon gasoline and automobiles.

The agreement contemplated by this Act is not that the money advanced by each district shall be employed in that district, nor that the reimbursement shall be in the proportion indicated in the "Pay-As-You-Go" Act.

The Constitution prohibits the creation of a state debt of any kind without a vote of the people. All means, whether direct or indirect, whereby a state debt is sought to be created without a vote of the people, fall under the condemnation of the Constitution.

The debt sought to be created by this Act, whether represented by bonds of the State or of the two districts, is a public debt applying uniformly against all of the people of the State, to be paid by state taxation applicable throughout the State. *It possesses all the essential characteristics of a state debt.*

In addition to what has been said, we think that the preamble of the Act is all that is needed to show that the debts proposed to be created by the districts are in reality the debts of the State.

It appears from the official record of the passage of the Bill, in the Journals of the Senate and of the House of Representatives, that as introduced in the Senate it contained only the State unit plan, and was so passed by the Senate. The two-district plan, containing the alternative choice committed to the State Highway Commission, was incorporated by the House as an amendment to the Bill. The preamble with its numerous "whereases" was not amended, and of course applies to one plan as well as the other. An examination of the preamble convinces one that the enterprise was essentially a State enterprise and consequently the two-district plan must be so considered.

The preamble recognizes the fact that the existing laws purported to provide a financial plan for the construction of a "State Highway System," *an enterprise, a creature of the State;* it declares that the existing plan was inadequate to

accomplish this purpose within a reasonable time, and that, from estimates submitted by the State Highway Commission, "a more excellent way" had been devised for the completion and maintenance of this State institution, a *state* highway system. That it was intended as such abundantly appears in the preamble.

The disposition of the income from the gasoline tax and the motor vehicle license tax is exceedingly significant. Out of it was to be paid the interest payments upon a *State loan* sufficient in amount to complete the State Highway System; a sinking fund for the retirement of *the loan;* the administration and operation of the *State* Highway Department; the maintenance of the entire *State* highway system. The State was to assume the existing reimbursement obligations of the Highway Commission which were to be cared for out of said income. A surplus was to be accumulated for the construction of additional *state* highways. That the only way to construct a state highway system was "with borrowed money." That *"an immediate investment by the State in a complete State highway system"* was in mind. That the advantages *to the State* were many and minutely detailed. The purpose of the Act was thus definitely and clearly expressed.

The application of the proceeds of the sale of the certificates of indebtedness to be issued by the highway districts is practically the same. Every indication is that they are intended to accomplish the identical purpose as the certificates issued under the State unit plan, and that the highway districts under the second plan are but the agents of the State, the conduit through which the purpose is to be accomplished. The certificates are to be executed, issued, and sold by the Governor and the State Treasurer, not by the districts, who are also authorized to issue notes in anticipation; the proceeds are to be paid to the State Treasurer and disbursed by him; the comptroller general is authorized annually to levy a tax upon all of the property within the districts; the county treasurers are directed to collect the same

and pay it to the State Treasurer, for the purpose of paying the principal and interest upon the certificates as they mature. The district commissioners will have discharged their duties upon organization and countersigning the certificates.

Without intending in the slightest degree to reflect upon the *bona fides* of the General Assembly whose members were unquestionably moved by their conception of the best interests of the State, we cannot escape the conviction that the plan proposed runs counter to the express provisions of the Constitution.

It has been suggested that, if Article 1 of the Act of 1929, the State unit plan, should be declared unconstitutional, Article 2, the two-district plan, would not be affected thereby and would stand.

Judge Cooley, at page 361 of his work on Constitutional Limitations (8th Ed.), thus declares the test: "When therefore a part of a statute is unconstitutional, that fact does not authorize the Courts to declare the remainder void also, *unless all the provisions are connected in subject-matter, depending on each other, operating for the same purpose,* or otherwise so connected together in meaning, that it cannot be presumed the Legislature would have passed the one without the other. * * * If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. *But if its purpose is to accomplish a single object only,* and some of its provisions are void, the whole must fail unless sufficient remains to effect the object without the aid of the invalid portion. And if they are *so mutually connected with and dependent on each other,* as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature intended them as a whole, and if all could not be carried into effect the Legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditioned or connected must fall with them."

This is the logical and generally accepted test. It must be recognized that the scheme of the Act was to present an alternative choice of two well-defined financial plans for the completion of a state-wide highway system. That choice was committed to the State Highway Commission, who at their option might either call upon the Governor, with the information required in detail by the Act, to issue certificates of indebtedness of the State to the amount named, and that, if such representations appeared satisfactory to the Governor, the certificates should be issued; or, if the Highway Commission did not favor such plan, they could proceed under what was denominated "the District Plan of Financing." It seems perfectly clear that if either plan should be declared unconstitutional, to force the commission to proceed under the other would necessarily destroy the alternative choice which the Act explicitly confers upon the commission. Suppose for instance that the district plan should be declared unconstitutional, the commission would be forced to proceed under the State unit plan, when as a matter of fact they were not willing to do so, but preferred the other; or *mutatis mutandis;* their option in either event would have been annihilated. It is impossible to say that either plan would have been originally adopted by the General Assembly. They had the opportunity of adopting either and declined, preferring to commit the option to the commission.

The counties and the highway districts which have been heretofore bonded to build highways, by the terms of the contracts which they have made under statutory authority with the State Highway Commission and with bondholders, have certain vested rights in both the gasoline tax for their interest and principal, and in and under their reimbursement agreements for the principal which cannot be fully protected and preserved from impairment if the present Act is to be carried out.

The Acts which have been passed, authorizing reimbursement agreements by counties and districts which are con-

tracts, constitute obligations which the county and bond-holders had a right to rely upon and which cannot be impaired, however minutely, under the provisions of our State and Federal Constitutions. *Martin v. Saye,* 147 S. C., 442, 145 S. E., 186; 1 Cooley's Constitutional Limitations (8th Ed.), 582–4.

"A statute which deprives the holders of the bonds or interest coupons or certificates of indebtedness of the State of any rights to which they were entitled under the laws in force at the time of the issue of such obligations, or which withdraws from State officers the power of carrying out the contract evidenced by such instruments of indebtedness, or diverts to other uses funds or property created or held under existing laws for the purpose of paying particular debts of the State, is unconstitutional as impairing the obligations of contracts." 12 C. J., 998.

"A fund set apart for the payment of a debt according to the provisions of the Act under which the debt was contracted may not be diverted from such purpose by a subsequent statute or ordinance. A statute providing for the creation of a sinking fund for the payment of bondholders becomes a part of the contract between the city and its bond-holders, and cannot subsequently be changed to their detriment." 12 C. J., 1013. *Martin v. Saye,* 147 S. C., 433, 145 S. E., 186.

The judgment of this Court should be that the injunctions prayed for in each of the cases above stated be granted.

MESSRS. JUSTICES COTHRAN and BLEASE, and MESSRS. CIRCUIT JUDGES BONHAM, TOWNSEND and HENRY concur with MR. CHIEF JUSTICE WATTS.

MR. JUSTICE BLEASE (dissenting) : To my mind there can be no question whatever as to the unconstitutionality of Article 1 of the Act under consideration, and all parts of the enactment, seeking to carry out the provisions of that Article. Section 7 of Article 10 of our Constitution expressly forbids the issuance of any "scrip, certificate or other evidence of State indebtedness" except for the purposes named

in that Section, and the purpose for which the certificates are to be issued in the proposed Act do not come within the exceptions provided.

Under the provisions of Section 11 of Article 10 of the Constitution, the General Assembly is forbidden "to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, endorsement or *otherwise,* except for the ordinary and current business of the State," without obtaining the approval of two-thirds of the qualified electors of the State.

These two provisions of the Constitution are so clear to me that I do not deem it necessary to discuss them with reference to Article 1, the "State Unit Plan of Financing," as set forth in the Act under review, for it is distinctly stated in that Article of the Act that the full faith, credit, and taxing power of the State are pledged for the payment of the certificates to be issued. Regardless of the manner in which the certificates are to be paid, they are to be debts of the State of South Carolina, and the people of the State are not permitted to approve their issuance.

With the views of the Chief Justice, generally, I am in accord. On account of the grave importance of the issues involved, however, I feel impelled to make a few observations of my own, touching what I conceive to be the real issue before the Court, namely, the constitutionality of Article 2 of the Act.

I concede the legal proposition advanced by Mr. Justice Stabler to the effect that, if parts of a legislative enactment, which are in violation of the Constitution, can be eliminated, leaving the law in such shape that full force and effect may be given to the remaining parts, which are not of themselves in conflict with the organic law, then it becomes the duty of the Court to save the constitutional parts, and not by a judicial declaration to declare null and void the entire Act. Along with that principle of our law, however, we must not lose sight of another greater principle, so long and well established that it has become elementary, to wit, that it is

the duty of the Court at all times to endeavor to find the real intention of the lawmaking body, as it has been expressed in its legislative Act, and this intention must be gathered from the whole enactment, and not from any one article, section, provision, sentence, or clause. If any part of an Act infringes a provision of the Constitution, and the elimination of such infringing part results in making it doubtful as to what the Legislature intended to do, and causes the Court to think that the legislation might not have been enacted if the General Assembly had known that some of its enactments were contrary to the Constitution, then it becomes the duty of the Court to hold the entire Act in violation of the Constitution. Expressed somewhat differently, the idea is that, if the striking out of the unconstitutional provisions of a legislative enactment causes that enactment to be left in such shape that the expressed, or evident, intention of the Legislature cannot be carried into effect, then the whole law must be set aside. It is the duty of the Court, when the Constitution does not forbid, to uphold the General Assembly by giving full effect to the declared intention of that co-ordinate branch of our government.

Let us then seek to ascertain the real intention of the General Assembly, and what it sought to do, in the legislation under consideration. We turn first to the title of the Act. The main purpose of a title to a Bill, introduced in the General Assembly, is to acquaint the members of the Senate and House of Representatives of the objects of the proposed legislation. After the Bill has become an Act, however, the title thereto may be considered by the Court in an effort to ascertain the legislative intent. The first and important words in the title show that the main purpose was "to provide for the construction and maintenance of the State Highway System"—no indication whatever of the construction and maintenance of any public highways owned by or under the control of any county, highway district, or other political

subdivision. All the other wording of the title is merely incidental to the one important idea of constructing and maintaining the State Highway System. The authorization of the issuance of evidences of indebtedness of the two highway districts, the disposition of the gasoline tax, motor vehicle license fees, and other revenues, and the provision for the administration and operation of the State Highway Department are all subject to the main object expressed, the construction and maintenance of the State Highway System.

Ordinarily, our legislative enactments do not carry with them *preambles*. The office of a *preamble*, when inserted, is to help make clear the purpose sought to be accomplished by the Legislature. The Act here has a *preamble* of considerable length, and, to my mind, throws much light upon what the General Assembly desired to do. It applies not only to Articles 1 and 3 of the Act, but to Article 2 as well. The first statement in that *preamble* is that: "Under the plan of financing provided by existing laws the construction of the State Highway System cannot be completed in less than twenty-one years." Without quoting the whole *preamble,* I call attention, somewhat more briefly in my own words, to some of the main declarations contained therein: The revenues to be derived annually during the next 24 years from the gasoline tax and the motor vehicle license fees (presumably from the whole state) will be sufficient, without resorting to a property tax, to pay the sums required to carry out the purposes of the Act: (a) Interest payments on the state loan (not the highway districts loans) sufficient in amount to complete the State Highway System immediately; (b) sinking fund and serial payments for retiring the principal on such a loan (state loan) within 24 years from the present time; (c) the administration and operation of the State Highway Department (not any highway district department); (e) compliance with the existing obligations of the State Highway Commission to reimburse moneys already advanced to it by counties and highway districts (not for the payment of any obligations of the two

state highway districts sought to be created) ; and (g) the production of an annual surplus for the construction of additional highways.

The statement is made that "the experience" of other states shows that the construction of a State Highway System (which is, of course, to be owned and controlled by the State) can only be done "with borrowed money."

I am much impressed by the last "whereas" of the *preamble,* which discloses a most commendable desire on the part of our lawmakers to build up a great state, and to build it as a whole state, not as counties, state highway districts, or other political subdivisions. Reference is there made to the contemplated improvement of the educational opportunities, the promotion of the agricultural, industrial, and labor interests of the State, the opening up of our seashore and mountain resorts, advertisement of our natural resources, the increase of the wealth and revenues, the equipment of the State with the means to compete with neighboring states, and the socializing influences upon our whole people. All refer to the State of South Carolina as an entirety, with not a single indication that any of the great advantages, which will be gained by the legislation, will inure especially to either of the highway districts sought to be created, but to the commonwealth as a whole. Personally, I am in full sympathy with the great things the General Assembly desired to accomplish for South Carolina, as they were expressed in the last "whereas" of the *preamble.* The manner in which they were expressed, however, and the other language of the *preamble* convince me, as a Judge, that the mind of the Legislature was set upon the building of a great highway system for the whole State of South Carolina and for the good of the entire commonwealth, with money borrowed by the State, to be repaid in years to come by the State, first from incomes derived in those years from the taxes and licenses on gasoline and motor vehicles, and, secondarily, from a tax on property. I am unable to find in the *preamble* a single word which looks to the creation of

any state highway districts, or any other kind of political subdivisions; nor can I find therein any language which conveys directly, or indirectly, any intention to create an obligation, the payment of which, in whole or in part, was to be assumed by any political entity, other than the whole State of South Carolina.

Except for a few distinguishing features, the plans outlined in Article 1 as to the "State Unit Plan of Financing," and those set forth in Article 2, providing for the two-district plan of financing, are practically identical. Under the plan of Article 1, all powers and authority are vested in the State Highway Commission, the Governor, and the State Treasurer. Under Article 2, practically the same powers given to the named officers in Article 1 are given to those same officials, except the performance of only a few nominal duties imposed upon a board of commissioners of each of the two State highway districts. These two boards of commissioners are to serve without any compensation whatever, and their main duty is to execute an agreement with the State Highway Commission, so that said commission may carry into effect the plan outlined in Article 1. After the State highway districts' boards of commissioners have executed that agreement, it seems that they have no further duty to perform, except that the secretaries of these district commissions are to attest the certificates of indebtedness and notes issued in the names of their respective districts. Under either plan, all certificates of indebtedness and notes are to be signed by the Governor and the State Treasurer, and these officials are charged with the sale of these securities. The district commissions have no power whatsoever as to any of the fund. They simply sign the agreement with the State Highway Commission, have their secretaries to attest the certificates and notes, place the corporate seal thereon, and retire until called upon by the State Highway Commission to repeat the operation.

Under both plans, the moneys received from the sale of the certificates and notes are placed in the hands of the

State Treasurer, and are entirely subject to the State Highway Commission. The certificates of indebtedness issued either in the name of the State or in the name of the highway districts are to be handled in an identical manner, and the State Highway Commission is given the power as to both certificates issued by the State or by the districts "to do all things ordinarily and customarily done in connection with the sale of State or municipal bonds." Nothing is to be done usually incident to the sale of highway district bonds, if such bonds are handled differently from State or municipal obligations. Under Article 2, the highways to be constructed in each of the districts must be "State Highways" in the respective districts, and the district commissioners have no right whatever to say on what highways the moneys shall be expended. Without hardly the change of a single word, the requirements necessary for the issuing of the State certificates of indebtedness are the same as those set out for the issuance of such certificates on the part of highway districts. In Article 1 the full faith, credit, and taxing power of the State is pledged for the payment of the principal and interest of the obligations to be made. In Article 2 the same pledge is made as to the taxing power of each of the highway districts. The theory upon which the distinction is made evidently is the one that, if the full faith, credit, and taxing power of the State cannot be pledged, then the full faith, credit, and taxing power of the two halves of the State may be pledged.

Regardless of the plan selected, under Article 3 "the entire amount of the revenues derived from the gasoline tax and the motor vehicle license tax (from the State as a whole, I interpolate), except such portion, if any, of the gasoline tax as shall exceed the amount of a gasoline tax levied at the rate of five cents per gallon," shall be turned over to or held by the State Highway Department, and paid out as provided in the Act. These funds are to be used first for the payment of the expenses of the State Highway Depart-

ment up to an amount not exceeding $450,000 annually, and no payment for any district highway department is allowed, for, in fact, there is to be none such. After providing for other payments from these funds, there is appropriated a sum sufficient to maintain the highways of the State Highway System. Any surplus of the estimated revenues for any calendar year is appropriated for the construction, reconstruction, and maintenance of State highways, and for the payment of other expenses of the State Highway Department. These provisions show that the purpose of the whole Act, whichever plan may be carried out, is to permit the State Highway Department, a body created for the whole State, to have the handling and disbursement of the revenues to be derived under the provisions of the Act, for the benefit of the whole State, and not for the particular benefit of either of the two highway districts proposed to be created.

If the plan outlined in Article 1 is unconstitutional, and it seems to be so conceded by some members of the Court, and if Article 2, which substanially the same plan, is within the constitutional provisions, the practical result on the one hand is this: That the State government, with all its powers, cannot borrow $65,000,000, to be repaid in future years, without the consent of two-thirds of the qualified electors of the State, for the purpose of building a highway system for the benefit of the whole State, under the supervision of the State Highway Department, having jurisdiction throughout the whole State, and the right to expend the amount of money borrowed; while on the other hand, the two halves of the State may join together, and, without the consent of the qualified electors, borrow $70,000,000, for the purpose of building a State Highway System, under the supervision of the State Highway Department, a body created for the whole State, with jurisdiction throughout the whole State, and the right to expend that larger amount of money.

But it is said that this Court cannot declare Article 2 of the Act violative of the Constitution, in the face of the former decisions of the Supreme Court in the cases of *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421; *McIntyre v. Rogers,* 123 S. C., 334, 116 S. E., 277; *Barnwell v. Matthews,* 132 S. C., 314, 128 S. C., 713; *Sullivan v. City Council of Charleston,* 133 S. C., 189, 133 S. E., 340; *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153; *Evans v. Beattie* 137 S. C., 496, 135 S. E., 538; and particularly the holdings in the two cases last named. I think the opinion of the Chief Justice is convincing that the cases at bar are not controlled in any way by any decision in either of the cases cited. As I view it, Sections 7 and 11 of Article 10 were not really involved in those cases, for it nowhere appears that there was any attempt, or effort of any kind whatsoever, to pledge the faith, credit, or taxing power of the State of South Carolina, either directly or indirectly, as to the obligations under consideration by the Court in those cases. The fact that the Court announced in some of the decisions that the obligations, which were being passed upon, were not such obligations as came within the purview of those two Sections, cannot now be used as an argument that the Court would have approved the obligations, even if they were such obligations as were included by the terms of those Sections. A careful reading of each of these decisions fails to disclose to me that there was any effort to create a debt of the State, either directly or indirectly. Here, the situation is entirely different, where, it is plainly apparent that the purpose is, first, to directly obligate the State, and, failing in the attempt, then to obligate it indirectly. The very language of the Constitution (Article 10 of Section 11), forbidding the General Assembly from increasing the public debt of South Carolina without the consent of two-thirds of the qualified electors of the State, shows that the farmers of the Constitution did not intend for the public debt to be even in-

directly increased, without the people's consent. When the makers of our organic law used the words "loan of the credit of the State, by guaranty, endorsement or otherwise," they intended for each and every one of those words to mean something. They knew that the words "loan," "guaranty," and "endorsement" had certain technical definitions. To be certain that in no way, either directly or indirectly, the provisions of the Section could be violated, they inserted the word "otherwise." An examination of all the other Sections of the Constitution pertaining to debts, whether by bond or otherwise, to be created by the various political subdivisions of the State, will show that in none of these were the words referred to in Section 11 used.

In answer to the holding of the Chief Justice that the Act contains such alternative provisions as to result in making it null and void under the familiar rule that the General Assembly, as the law-making power of the State, cannot delegate to any other body the right to make a law, it is contended that the elimination of Article 2 of the enactment would have the effect of eliminating one of the alternative provisions, and it is urged that, as a result of such elimination, the Act would be still complete, with no choice on the part of the State Highway Commission as to which of the two plans it will adopt. It necessarily follows, so it is stated, that the objection to the law as an alternative enactment is without merit. I am in full accord with the holding of the Chief Justice in this regard. If it be conceded, however, that the position taken in reply to his holding is correct, another interesting question occurs to my mind, and I believe that the proper answer thereto is entirely sufficient to show that it is not possible for this Court to carry out the expressed intention of the Legislature. Whatever may have been the reasoning of the General Assembly, upon which it based its expressed desire, it must be apparent that it was the intention of the Gerenal Assembly not to confine the State Highway Commission to any

one plan for the building of the State Highway System. It thought, and no doubt wisely, that the members of that commission better acquainted that the legislators were with the problems of road building, should not be limited too much in their plans for financing the great project ahead. All through the Act runs the idea that the State Highway Commission should be fettered as little as possible with the securing of necessary money, and the disbursement thereof, in the building of a great system of public highways in South Carolina. The legislators sought to give the State Highway Commission a choice of at least two plans. In my opinion their wish cannot be accomplished because the Constitution of the State stands in the way. Contrary, therefore, to the clearly announced desire of the General Assembly, the State Highway Commission would be limited to one plan. It could not, even at a saving of at least $5,000,000 to the people of the State, exercise the choice, which the General Assembly wanted it to have the right to exercise. Surely a law, which clearly intended to give to one of the departments of the State great discretion, cannot he held fully complete in every detail, when it is obvious that the Constitution stands in the way of the exercise of that discretion. On the other hand, if the State Highway Commission has the choice of choosing between the two plans, it is an alternative law.

The argument is advanced that under the decision of the Court in *Evans v. Beattie, supra,* the General Assembly could have divided the State into two highway districts, as has been done in the law under consideration, and, in that connection, could have enacted all the essential principles and provisions of the present enactment, and, by leaving out all references to indebtedness by the State as a whole, could have accomplished what it has attempted to accomplish in the legislation involved in the cases at bar. That is not a question before the Court at this time for determination. Granting that this course might have been pur-

sued, the fact remains that the lawmakers did not see fit to follow that path. As I have endeavored already to show, the main purpose of the Act under review was to build a State Highway System out of moneys collected from the State as a whole.

I agree with all that the Chief Justice and Mr. Justice Stabler have said as to how this Court should hesitate always to declare any Act of the General Assembly, a coordinate branch of our government, void for any reason. I have so expressed myself heretofore many times. When it appears, however, to a member of this Court that an Act is unconstitutional, it becomes his duty not to hesitate to so declare, for the Justices and Judges of this Court have solemnly obligated themselves to "preserve, protect, and defend the Constitution of this State." It is true the highways we need and want so much were not needed and wanted when the Constitution of 1895 was adopted. We should not permit our desires to cause us to strain the letter of our governmental charter. If the people of this State and their representatives in the General Assembly desire the State to borrow money, to be repaid in future years, for the purpose of building a great highway system, there are two ways under the law by which it may be done. The first is by a vote of the qualified electors approving a loan for the purpose. The second is by an amendment to the Constitution, granting the General Assembly the right to effect the necessary loan. As I see it, any other way, and even any indirect way, is forbidden by our Constitution. I am reminded of what the distinguished Chief Justice Taney of the Supreme Court of the United States said in the famous Dred Scott case, to the effect that: "No change in public opinion on questions of policy can ever be given any weight in construing the provisions of a constitution where the meaning is clear, for the adoption of a construction that might be deemed wise at one time and unwise at another would abrogate the judicial character of the Court and make it the reflex of the

popular opinion or passion of the day." *Scott v. Sandford,* 19 How., 393, 15 L. Ed., 691.

When the Court says the Act is Consitutional; in my humble opinion, it tells the General Assembly that it may do *indirectly* what it is absolutely prohibited from doing *directly* by the Constitution of South Carolina. This in not in accord with the great principles of American constitutional law, as expounded through all the ages by the Supreme Court of the United States, and the highest Courts in all the States of the Union. Without citing even a small number of the thousands of authorities, which might be named to sustain the principle I have in mind, I call attention to what was decided by the Supreme Court of the State of New York in the case of *People v. Draper,* 15 N. Y., 532, cited in that well-recognized authority, Corpus Juris, Vol. 12, p. 719, as follows: *"Every positive direction in a constitution contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision."*

MR. CIRCUIT JUDGE BONHAM (dissenting) : The history of these cases, which are brought to test the validity of the Act of the General Assembly, approved March 14, 1929, and which is commonly known as the State Highway Bond Act, is fully related in the leading and the dissenting opinions. It is, therefore, unnecessary to repeat that history here.

The opinion by the Chief Justice holds that the "State Unit Plan," provided for in Article 2 of the Act, is unconstitutional, because it violates the provisions of Section 7 and Section 11 of Article 10 of the Constitution, in that it creates a new debt and pledges the full faith, credit, and taxing power of the State for its payment, without having submitted the question to the qualified electors of the State at a general election.

In this conclusion I concur.

Does the same, or any, constitutional disability attach to Article 2 of the Act in its provisions for the two-district plan? The .advocates of the validity of that plan buttress themselves behind the principles announced in the cases of *Briggs v. Greenville County,* and *Evans v. Beattie et al.,* both reported in 137 S. C. Reports. If the two districts created by the Act are such districts as are considered in those cases, the position is well taken; otherwise, the position is not tenable. A study and analysis of the two-district provisions of the Act convinces me that they are not such districts as are dealt with in those cases. Those districts were small subdivisions of the State, scattered here and there. These districts comprise the entire terrain of the State. They are the State in geographical extent. They contain all of the property, the taxable property in the State. Many of their functions are to be performed by officers of the State. They are not independent political entities. A pledge of the full faith, credit, and taxing power of these districts as security for the certificates of indebtedness, they are authorized by the Act to issue, is a pledge of the full faith, credit, taxing power, and every material resource of the State. No provision is made to submit the question to the qualified electors.

I cannot escape the conclusion that Article 2 of the Act is unconstitutional for the reasons which render Article 1 unconstitutional. Hence, I concur in the opinion of the Chief Justice that the Act is unconstitutional. I do not concur in all of his conclusions.

I have come to this conclusion with regret, for I am in sympathy with the desire of the State Highway Commission to link the parts of the State together by a system of proper highways, in the shortest practicable time. I am convinced that, if the matter were properly presented to the people, they would, by their votes, approve either of the plans proposed in this Act.

MR. CIRCUIT JUDGE TOWNSEND (dissenting) : The completion of a State Highway System, exceeding in cost many times the annual income of the State, involves an extraordinary expenditure, which forms no part of the ordinary and current business of the State on the regular recurring current expenses of the government. *Morton Bliss & Co. v. Comp. General,* 4 S. C., 430.

The exception from the prohibition in the sixteen amendment to the Constitution of 1868 and Section 11 of Article 10, Constitution of 1895, of ordinary and current business of the State, is in contrast to "extraordinary expenditures" referred to in Section 7, Art. 9, Constitution of 1868; and shows that the requirement of securing the approval of the electors before creating any new debt or obligation applies to the creation of any new debt or obligation on the part of the State for extraordinary expenditures, or expenditures over and above the ordinary and current expenses of the government which annually recur. *Robertson v. Tillman,* 39 S. C., 301, 302, 17 S. E., 678.

The exception of any particular case presupposes that those which are not excepted are within the prohibition. *Rhode Island v. Mass.,* 12 Peters, 657, 9 L. Ed., 1233.

MR. CIRCUIT JUDGE HENRY (dissenting) : In concurring in results in the opinion filed by Chief Justice Watts, we only wish to remark that two errors or mistakes have been made—one by the legislature, the other by the Court:

(1) By the legislature. In its effort to confer a great benefit upon the State by road building, in tying two plans together, to wit, the State and district plans, it has formed a *knot,* which, if cut, must be done by the exercise of the exclusive prerogative of the legislature. The knot makes the so-called Act inoperative for that reason. The will of an executive has to be exercised before the so-called Act can be made effective. The legislature has overlooked a very simple principle in physics—that two equal bodies can-

not occupy the same space at the same time. The very meaning of *an Act* is something done, accomplished, finished.

(2) The Court's error is in the discovery of a political division of the State that is not limited by the provisions of Article 10, § 5, and outside of the pale of the Constitution, resulting in a riot of bond issues, thereby leaving the taxpayers the minority without protection, the only purpose or necessity for a Constitution.